**John Robert KOCHEVAR, Petitioner, Appellant,**

v.

**STATE of Minnesota, Respondent.**

**No. 49201.**

Supreme Court of Minnesota.

June 8, 1979.

C. Paul Jones, Public Defender, and J. Christopher Cuneo, Asst. Public Defender, Minneapolis, for petitioner, appellant.

Warren Spannaus, Atty. Gen., St. Paul, Keith M. Brownell, County Atty., Duluth, Mark Rubin, Asst. County Atty., Virginia, for respondent.

Heard before SHERAN, C. J., KELLY, and SCOTT, JJ., and considered and decided by the court en banc.

SCOTT, Justice.

This is an appeal from the postconviction order of the Sixth Judicial District Court which denied appellant's request to vacate his conviction for third-degree murder and to permit him to withdraw his guilty plea. We affirm.

On June 20, 1974, appellant was arrested for the shooting death of Janice Misquadace, a woman he had lived with for about five years. He was arraigned on July 1, 1974, after being indicted for first-degree murder by a grand jury. Appellant pleaded not guilty and went through various pre-

trial hearings. On October 31, 1974, after the jury was selected, but before it was sworn, appellant decided to accept the state's offer to plead guilty to murder in the third degree in exchange for a recommendation by the state that a cap of twelve years be placed on the sentence. Pursuant to this agreement, appellant appeared before the district court on the afternoon of October 31, 1974, to withdraw his plea of not guilty and plead guilty to the charge of third-degree murder. At the hearing, the trial court questioned defendant regarding the voluntariness of the plea and the rights he was waiving. After some inconsistency in his statements, he ultimately stated that he entered his plea voluntarily because he was guilty of third degree murder. Appellant was then put under oath and asked some preliminary questions by the court. Thereafter, at the request of the court, appellant was questioned by the prosecutor to establish a factual basis for the guilty plea.

Appellant testified that he and the victim, Janice Misquadace, had been living together for about five years. They had two children. On June 20, 1974, appellant and Misquadace went to a local tavern and drank 3.2 beer for several hours. From there they went to another tavern and continued to drink beer until about 12:30 a. m. They arrived home about 1 a. m. and drank a six-pack of beer in the car. While in the car, they "were sort of arguing back and forth" about a "[f]amily mix-up." Misquadace then wanted to go back to the tavern for some more beer, but appellant suggested that they go into the house. As they entered the home, they were still arguing.

Appellant stated that, after entering the house, Misquadace immediately went into the front room and got a gun. Appellant also got a gun from the front room. She had a .22 rifle which she said was loaded, and he had a loaded .410 shotgun. Appellant was able to take the .22 (which was actually unloaded) away from Misquadace. He then loaded the rifle with a shell and fired a shot "to scare her." She dropped to the floor, apparently, according to appellant, "playing possum." Appellant stated

that he had no intention to shoot Misquadace. She remained on the floor for a few seconds, during which time appellant ejected an empty cartridge from the .22, put another shell in the chamber, and set the gun by the telephone in the kitchen. He also told Misquadace not to touch the gun because it was loaded. Appellant testified as follows as to what occurred next:

"A Then when I went to sit down there and was going to light a cigarette, she said now you are really going to get it, and she came up and charged and grabbed the .22.

"Q You are claiming she grabbed the .22?

"A Yes.

"Q And then what happened?

"A I grabbed it at the same time. We were scuffling around there, and that is when it went off and she got shot."

Appellant was asked whether he hit Misquadace over the head with the stock of the .410 shotgun. He responded that he did not think that happened, but "it might have been possible." Appellant also stated that he did not remember saying to Misquadace, "I am going to shoot you * * *." In addition, appellant was questioned about a statement he gave police in which he said that he shot Misquadace. Appellant claimed that he had really said "she got shot" and had mentioned the error in wording previously.

The prosecutor, in conclusion, inquired of appellant as follows:

"Q You pleaded guilty here, Mr. Kochevar, to Third Degree Murder, and did you enter that plea because, in fact, you are guilty? You seem reluctant here. You hesitated with the judge before, and now you are hesitating here. You are either guilty or you are not guilty of what you pleaded guilty to.

"The Court: What is your answer, Mr. Kochevar?

"Defendant: I told him I would plead guilty to it.

"Q Well, I ask you now—I know you pleaded guilty and isn't that plea entered in here—plea of guilty to Murder in the Third Degree of Janice Misquadace because you are definitely guilty. You are looking at your lawyer. Is there any question that you are guilty?

"A I plead guilty. I am guilty.

"Q · Well, you are not—

"The Court: All right. He said it now. He said I am pleading guilty. I am guilty. Is that right, Mr. Kochevar?

"Defendant: That is the way I will take it.

"The Court: That is the way you are saying it. Right?

"Defendant: Yes.

"The Court: All right."

Upon further questioning by the court, appellant again stated that he did not intend to kill Misquadace, but admitted that he had used a weapon against her for · the purpose of scaring her or causing her to have fear.

At the request of the court, the prosecutor then stated for the record the evidence he would offer should the case go to trial. The state's primary evidence was the anticipated testimony of John Misquadace, the victim's brother, who slept at appellant's residence ·on the night in question. According to the prosecutor, the witness would give the following testimony:

" * * * He [the witness] heard John Kochevar [appellant] make the statement, 'I am going to shoot you and I am going to shoot someone else; someone else is going to get shot too.' He felt the other person that was going to get shot was himself, that he stayed in bed and listened to this fight. They went ˙into their bedroom, still fighting, and they came out and they each had a gun. He said that defendant Kochevar took the .22 rifle away from [his] sister Janice. [Appellant] must have loaded it in the kitchen. Janice was standing by the bedroom door. Robert [appellant] said, 'I am going to shoot you.' Then the little girl

Juanita [appellant's child] said, 'Don't shoot my mom,' and he shot. Janice stood there. She did not seem to be hit. Then Janice seemed to faint on the floor. Janice got back up and he told her to get in bed. Janice said, 'Go ahead and shoot me.' Robert said, 'If you touch this barrel, I am going to kill you.' [The witness] didn't see them fighting in the kitchen, but at this point [his] sister Janice called for [him] to help her. [He] got up and started to dress, and * * * heard [his] sister Janice say, 'Johnnie boy, come here and help me.' Janice started swearing at Robert and said, 'You hurt my knee.' [He] came out of the bedroom and [he] saw Robert aiming down at the floor with the .22, and then [he] heard the shot go off. [He] looked at [his] sister and could see she was hit."

The prosecutor also stated that other state evidence would show that Misquadace was shot as she was lying on the floor, with the barrel of the rifle being two to three feet from the point at which the bullet entered her head. There was no objection to this recitation by the prosecutor.

The defense attorney then spoke to the advisability of the plea. He stated that, in his opinion, there would be a "definite possibility" that a jury could return a verdict of first, second, or third degree murder against appellant, and therefore he advised appellant that if he was "concerned about limiting his prison time" he should accept the state's offer. When asked by the court whether he agreed that appellant's testimony satisfied the felony-murder rule portion of the third-degree murder statute, appellant's trial attorney said that he did, "[v]iewing the entire incident between the first shot and the death as res gestae, all one behavioral incident * * *."

Shortly thereafter, the court accepted appellant's plea of guilty to murder in the third degree and stated:

" * * * Number one, from the proposed testimony of the State, the Court is of the opinion that a jury could find you guilty of Murder in the First Degree, and that would be primarily based on the fact

that John Misquadace would testify, according to the county attorney, that he saw you pointing the gun at his sister, that would indicate premeditation to the Court and possibly a guilty verdict by the jury on first degree murder. Secondly, the Court feels that from the testimony offered or proposed by the State you could also be found guilty of murder in the second degree, and that would be without premeditation but with intent, and from your own testimony here this morning, the Court feels that there is a factual basis for the Court to accept your plea of guilty to the charge of Murder in the Third Degree, particularly that part of the statute which reads 'commits or attempts to. commit a felony upon or affecting the person whose death was caused.' " [1]

On December 31, 1974, the court sentenced appellant to imprisonment for an indeterminate term not to exceed twelve years. Subsequently, appellant petitioned the district court for postconviction relief on the grounds that his guilty plea was not properly accepted by the district court and that the recently-adopted "matrix" system adversely affects the terms of his plea agreement. He sought to have his conviction for third degree murder vacated and to be permitted to withdraw his guilty plea. In the alternative, he requested a credit, as time served, for the 66 days he spent in jail while unable to secure pretrial release on bail due to indigency.

On April 4, 1978, a postconviction hearing was held in Virginia, Minnesota. Appellant's counsel, at the time he pled guilty, testified that during plea negotiations appellant was very concerned about the amount of time he might have to serve in prison. He stated that he told appellant "[t]hat on a zero-to-12 sentence, that if everything went well, that if he had a very clean record at Stillwater, and that if the parole board acted favorably on his first application, that with good luck he could or he might be out in as early as two to three years." Later, he testified that he informed appellant that it was "possible" that he could be released from prison within 2 to 3 years.

Appellant stated at the hearing that defense counsel had told him that, if he "behaved," three years "might" be the maximum on a 0–12 year sentence. He claimed that being released from prison within 3 years was an important factor in deciding to plead guilty, and that he "kind of took it like a promise." The prosecutor who negotiated the plea testified that during plea negotiations he had informally discussed with defense counsel the length of time appellant might actually serve. He indicated he thought it would be "maybe a couple of years." He said that appellant may have overheard the discussion. However, he stated that he made no "promises" as to the amount of time appellant would actually be imprisoned.

After appellant began to serve his sentence, the Minnesota Corrections Board instituted a "matrix system" under which the time to be served in prison is computed on the basis of the severity of the offense and a ranking given to the inmate's risk of failure on parole. According to the "matrix" appellant, who has received the best possible ranking with respect to his risk of failure on parole, must serve at least six years of prison time, because of the severity of the crime to which he pled, before he will be considered for parole.

---

1. The pertinent legislation defining third degree murder, Minn.St. 609.195, reads as follows: "Whoever, without intent to effect the death of any person, causes the death of another by either of the following means, is guilty of murder in the third degree and may be sentenced to imprisonment for not more than 25 years:

 * * * * * *

"(2) Commits or attempts to commit a felony upon or affecting the person whose death was caused or another, except criminal sexual conduct in the first or second degree with force or violence within the meaning of section 609.-185."

Minn.St. 609.225, subd. 2, reads: "Whoever assaults another with a dangerous weapon but without inflicting great bodily harm may be sentenced to imprisonment for not more than five years * * *."

On July 7, 1978, the court filed its findings of fact, conclusions of law, order and memorandum. Appellant was granted 66 days of jail time credit, but his petition in all other respects was denied.

The following issues are therefore presented:

(1) Was an adequate factual basis established for the acceptance of defendant's guilty plea to third-degree murder?

(2) Was appellant's guilty plea induced by an unfulfilled promise so as to permit appellant to withdraw his plea?

(3) Should appellant's sentence be modified to conform to his alleged expectations?

1. Before a guilty plea may properly be accepted by the trial court it must be established that a factual basis exists for concluding that the defendant actually committed an offense at least as serious as the crime to which he pled guilty. *State v. Goulette*, 258 N.W.2d 758 (Minn.1977); *State v. Hoaglund*, 307 Minn. 322, 240 N.W.2d 4 (1976). Although it is preferable for the factual basis to be established from the defendant's own testimony when he pleads, see, e.g., *Holscher v. State*, 282 N.W.2d 866 (Minn.1979); *State v. Goulette, supra*, recent decisions have acknowledged that this is not the exclusive method. See, *State v. Holscher, supra*, (factual basis consisted of prosecutor's summarization of state's evidence, which was unchallenged by defendant); *State v. Neumann*, 262 N.W.2d 426 (Minn.1978) (factual basis supplied by testimony from partial trial); *State v. Goulette, supra*, (defendant denied he was guilty, factual support for plea based on defense counsel's summarization of state's proposed evidence); *State v. Hague*, 304 Minn. 139, 229 N.W.2d 168 (1975) (factual basis established, in part, by testimony of

complainant); *State v. Fisher*, 292 Minn. 453, 193 N.W.2d 819 (1972) (defendant had no recollection of the crime, factual support provided by proposed evidence). Under the circumstances surrounding this plea, a factual basis was established by both the state's proposed evidence and defendant's testimony at the time he pled.

The state's evidence, as summarized by the prosecutor, would have shown that the victim was lying on the floor with the barrel of the gun about two to three feet from her at the time she was shot. A state witness would testify that he saw appellant aiming the gun at Misquadace just before she was killed and also heard appellant say he was going to shoot her. These facts, if believed by a jury, would support a conviction of either first- or second-degree murder.[2] But, more significantly, appellant's own testimony provides a factual basis for his plea. The felony murder doctrine is properly applied when the underlying felony is aggravated assault.[3] See, *State v. Carson*, 300 Minn. 527, 219 N.W.2d 88 (1974); *State v. Smith*, 295 Minn. 65, 203 N.W.2d 348 (1972); *State v. Morris*, 290 Minn. 523, 187 N.W.2d 276 (1971). In this case, the felony and the killing, according to the testimony of appellant, are parts of one continuous transaction and thus the felony murder rule is applicable. See, 58 A.L.R.3d 851 (1974). Appellant stated that he fired once at Misquadace to scare her and as a result she dropped to the floor. Appellant then reloaded the rifle, setting it in the kitchen. Within seconds Misquadace rose from the floor, fought with defendant over the rifle and was shot. This unbroken sequence of events, from the felony to the killing, justifies application of the felony murder rule.[4]

---

2. See, Minn.St. 609.185(1) and 609.19.

3. The felony murder rule is codified in Minn.St. 609.195(2), and aggravated assault, a felony, is proscribed by Minn.St. 609.225. See, n. 1, *supra*.

4. The postconviction court similarly reasoned: " * * * Here the time lapse between the first shot and the fatal second shot was a matter of seconds. According to petitioner's own

statement he fired once to scare the decedent and she dropped to the floor. He then reloaded the rifle and, retaining control over it, leaned it against the wall next to his chair. She rose from the floor, struggled with him for possession of the rifle, and was fatally shot. Under these facts this court is convinced that there had been no termination of the aggravated as-

■ It should be noted that appellant also contends that the plea was not intelligently made because the court did not inform him of the specific defenses which he might assert at trial, i. e., intoxication and self-defense. This contention is without merit.

■ It is well settled that a defendant must have an understanding of the law as it relates to the facts. *McCarthy v. United States*, 394 U.S. 459, 89 S.Ct. 1166, 22 L.Ed.2d 418 (1969). However, a trial court need not specifically inform him of all his constitutional rights, *State v. Chounard*, 299 Minn. 216, 216 N.W.2d 908 (1974); *State v. Propotnik*, 299 Minn. 56, 216 N.W.2d 637 (1974), nor must it delineate all possible defenses which may be assertable at trial. *State v. Nace*, 308 Minn. 170, 241 N.W.2d 101 (1976). As this court stated in *Nace*:

" * * * It is true that defendant was not asked on the record about the defense of entrapment, but the record shows that defendant had an opportunity to consult with ·counsel, and presumably counsel adequately informed him concerning any possible defenses. [Citation omitted.]

" * * * We emphasize again that in cases such as this, where the record justifies the conclusion that the defendant's plea was voluntarily and knowingly made, the defendant cannot expect to obtain relief on a claim that the trial court did not inform him of all possible defenses." 308 Minn. 170, 241 N.W.2d 102.

The record in this case·discloses that appellant's trial counsel, an experienced criminal attorney, thoroughly. discussed with appellant the various alternatives available to him, including the advantages, disadvantages and probabilities associated with each. Accordingly, consistent with the *Nace* decision, appellant's contention that his guilty plea was improperly accepted because the trial court failed to specifically inform him of possible defenses must be rejected.[5]

■ 2. Appellant claims that he should be permitted to withdraw his guilty plea because it was induced by an unfulfilled promise, to wit: if appellant "behaved himself" he would be entitled to parole within 2–3 years. It is well settled that an unqualified promise which is part of a plea arrangement must be honored or else the guilty plea may be withdrawn. *Olness v. State*, 290 Minn. 198, 186 N.W.2d 706 (1971); *Santobello v. New York*, 404 U.S. 257, 92 S.Ct. 495, 30 L.Ed.2d 427 (1971). Appellant, however, has failed to show that the representations made to him constitute an unqualified promise, and accordingly his contention must be rejected.

■ The postconviction court found that no such "promise" was made to appellant. As·the court stated in its findings of fact:

"At the time he pled guilty to third degree murder, Petitioner realized and understood that he would be subject to the full punishment of the law, to wit: twelve years imprisonment. Petitioner realized and understood that any consideration for his early release on parole would be a matter within the discretion of the Corrections authorities.. Petitioner was hopeful of being released in as little as two or three years in accordance with the estimates of counsel."

Factual findings, such as this, of a postconviction court will not be disturbed if supported by sufficient evidence. *Barness v. State*, 290 Minn. 509, 187 N.W.2d 111 (1971). Since the record contains abundant support for the court's finding, it must be sustained. For example, appellant's trial counsel testified at the postconviction hearing as follows:

"Without any question Bob [appellant] . asked me about the·amount of time he

---

sault so as to preclude application of the felony murder rule. The killing was part of the res gestae of the petitioner's assault upon decedent with a loaded rifle. They were part of one continuous course of conduct."

5. See, Rule 15, Rules of Criminal Procedure (effective July 1, 1975), now controlling, for the procedures to be followed in accepting a defendant's guilty plea.

might be expected to serve. It was very important on his mind, and my recollection is that I told him basically as follows: That on a zero-to-12 sentence, that if everything went well, that if he had a very clean record at Stillwater, and that if the parole board acted favorably on his first application, that with good luck he could or he might be out in as early as two to three years.

"I told him on a zero-to-12, his expiration date would be about nine years, so that without any question, he would not serve any more than nine years, of course, absent the fact of committing another crime while in prison.

"So I told him the range was probably two at a very minimum and nine at the most, and I told him that he probably would not serve any more than five.

"I also note that I told him, like I tell any client who is going to do what they call big time or hard time at Stillwater or St. Cloud, that I'm just making my best estimate from my experience, that once they go into the prison, it's beyond my control and even beyond the Judge's; it's up to the parole board there.

"But the figures I was quoting were based on assumptions or guesstimates that I was making from my experience."

Appellant himself stated that he thought that on a zero-to-12 year sentence he could "possibly get a parole within three years if I behaved myself down there. But it would be up to the parole board at that time to be the judge of my behavior and everything, * * *." Similarly, the record discloses that at the time he pled, appellant understood the total ramifications of his plea:

"The Court: Was any leniency promised you by anyone other than that which the county attorney and your attorney have stated here in open court in your presence?

"Defendant: No.

"The Court: Do you understand, Mr. Kochevar, that by a plea of guilty you may be sentenced to imprisonment or confinement up to twelve years according to your plea agreement. Do you understand that?

"Defendant: Yes."

And, finally, the record shows that the sentencing court instructed appellant as follows:

" * * * the time and duration of your confinement under the sentence should be that determined by the Minnesota Corrections authority, and that, of course, depends, Mr. Kochevar, upon the way you act and conduct yourself at Stillwater. Hopefully, I hope that you will make a good prisoner, that you will see to it that you do the best job you can and that the better job that you do down there, the sooner the penal authorities may consider your release. I am not in any way indicating that your release will be any earlier than the twelve year maximum which I have imposed, but past history and experience leads me to believe that if you do behave well that you might be considered for an early release; but there again, that depends upon your own behavior—your own conduct—and it will have to be left to the wisdom and good judgment of the Minnesota Correction authority. Do you have any questions now, Mr. Kochevar?

"Defendant: No."

The above evidence adequately supports the postconviction court's finding that no unqualified promise was made to appellant. In this case the record shows that appellant understood he was subject to the full punishment of the law and thus he should not be allowed to withdraw his plea because an "unwarranted hope" has not been realized. See, *Olness v. State, supra.*

In a related argument, appellant claims that his plea was not voluntarily, knowingly, and intelligently made because he was not informed that he would have to serve six years of prison time before he was realistically eligible for parole. As discussed above, though, appellant knew that the amount of time he would be in prison was a matter within the discretion of the corrections authorities. Subsequently, in their discretion, the corrections authorities

have adopted a matrix system[6] for determining when an inmate should be released, which assigns a target release date of six years to appellant. Accordingly, appellant was accurately advised of the possible time of parole and thus his plea was knowingly made.

3. Appellant's final contention is that his sentence should be modified to reflect the intentions of the sentencing court. The postconviction court did not refer to this argument, apparently because the claim was not raised in appellant's memorandum to the court.[7]

 A critical part of appellant's argument is that the intent of the sentencing court, in imposing sentence on appellant, was to make him eligible for an early parole, i. e., within two to three years. However, the record does not reflect such an attitude of the sentencing court. Rather, the court seemed primarily interested in giving effect to the negotiated plea agreement which placed a maximum of twelve years on appellant's sentence.[8] As discussed above, the court, consistent with pertinent legislation, intended for the corrections authorities to determine when, within this twelve-year range, appellant might be paroled. Thus, contrary to appellant's claim, the intentions of the sentencing have not been frustrated by the implementation of the matrix system.[9]

The record clearly shows that the sentencing court's intentions have not been frustrated by the implementation of the matrix procedure. The court was primarily concerned with placing a maximum on appellant's sentence in accordance with the plea agreement. The judge specifically informed appellant at the time of sentencing that eligibility for parole "will have to be left to the wisdom and good judgment of the Minnesota Corrections authority." The postconviction court's decision is therefore affirmed.[10]

Affirmed.

---

6. It should be noted that the validity of the matrix system was recently upheld by this court in *State ex rel. Taylor v. Schoen*, 273 N.W.2d 612 (Minn.1978). In that case, the court specifically held that the matrix system does not constitute determinate sentencing in contravention of pertinent legislation, nor does it invade the inherent powers of the court. Additionally, it must be pointed out that the matrix is not mechanically applied to all inmates, but is used as a guide by the parole board in making its determinations.

7. This issue, however, was raised in appellant's pro se petition for postconviction relief, dated September 6, 1977. Accordingly, the question was adequately raised below and thus is properly before this court.

8. Appellant, of course, benefited greatly. If appellant had gone to trial on the crime charged, first-degree murder, and been convicted, he would have been sentenced to life in prison. See, Minn.St. 609.185. Thus, as the record shows, appellant pled guilty to third-degree murder to limit his exposure to prison. The trial court, in imposing sentence, merely gave effect to the plea agreement entered into between the state and appellant.

9. We also note that the record contains a letter from the sentencing judge to appellant, written in response to appellant's correspondence, which indicates that the adoption of the matrix system has not interfered with the judge's intentions.

10. We note that subsequent to the filing of the briefs in this case appellant has raised the argument that application of the matrix system to him constitutes an ex post facto law. In support of this contention, appellant relies on the decision in *Geraghty v. U. S. Parole Commission*, 579 F.2d 238 (3 Cir. 1978), cert. granted, —— U.S. ——, 99 S.Ct. 1420, 59 L.Ed.2d 632 (1979) (No. 78–572). We are unpersuaded by the *Geraghty* reasoning. Rather, we agree with the position taken in *Shepard v. Taylor*, 556 F.2d 648 (2 Cir. 1977), and *Ruip v. United States*, 555 F.2d 1331 (6 Cir. 1977), that the subsequent adoption of guidelines designed to aid the correction authorities in making their parole decisions does not constitute an ex post facto law. Accordingly, we reject appellant's claim.