## STATE v. GERALD GEORGE SMITH.

203 N. W. 2d 348.

December 8, 1972—No. 42745.

*C. Paul Jones,* State Public Defender, and *Mollie G. Raskind,* Assistant State Public Defender, for appellant.

*Warren Spannaus,* Attorney General, and *Wayne R. Farnberg,* County Attorney, for respondent.

Heard before Knutson, C. J., and Otis, Rogosheske, and Schultz, JJ.

ROGOSHESKE, JUSTICE.

Defendant, Gerald George Smith, appeals from a judgment of conviction of murder in the third degree. The major issue raised is whether the evidence, viewed most favorably to support the verdict, is sufficient for the jury to find beyond a reasonable doubt that defendant's assault upon his wife was the proximate cause of her death. We affirm.

On November 29, 1969, Mr. and Mrs. Smith were at a bar in Redwood Falls. After returning home, they started arguing about who would pay the babysitters and take them home; the argument intensified and blows were exchanged when they went upstairs. Defendant's wife then fell down a flight of stairs, bumping into a radiator. Defendant followed her downstairs.

After more pushing and chasing, Mrs. Smith fell to the floor of the dining room. At this point the evidence becomes less explicit, but defendant agrees that the jury could reasonably find that defendant kicked or "stomped" his wife on her neck. Mrs. Smith died from a massive brain hemorrhage. The jury found defendant guilty of third-degree murder.

An autopsy was conducted by Dr. Robert Fedor, a clinical and anatomical pathologist. Dr. Fedor testified that death resulted from an extensive subarachnoid hemorrhage at the base of the brain as a result of a blow, evidenced by a bruise on the left side of Mrs. Smith's neck which could have been caused by an object with the same configuration as one of the boots defendant was wearing on the night Mrs. Smith died.

Defendant contends that, even if he caused the neck bruise, there is insufficient proof that the blow on the neck or any other trauma was the proximate cause of the fatal hemorrhage. Specifically, defendant argues that the evidence does not exclude a spontaneously ruptured aneurysm as the actual cause of the fatal hemorrhage. The key to defendant's argument is the testimony of Dr. Calvin Bandt, associate pathologist for Hennepin County, that a subarachnoid hemorrhage at the base of the brain is not thought to be caused by trauma unless there is a skull fracture or massive head injury beyond that present in this case.

We reiterate that our function in reviewing evidence "is not to try the facts anew but to determine from the record as a whole whether the evidence permits the inference required to justify a conviction." State v. Crosby, 277 Minn. 22, 24, 151 N. W. 2d 297, 299 (1967); State v. Carlson, 280 Minn. 77, 80, 158. N. W. 2d 199, 201 (1968); State v. Ellingson, 283 Minn. 208, 211, 167 N. W. 2d 55, 57 (1969). Dr. Fedor testified that he dissected the blood vessels on which aneurysms are known to occur and concluded there was no ruptured aneurysm. Dr. Bandt's opinion that the hemorrhage was not caused by trauma was admittedly limited by the fact that he had not seen the body nor performed or assisted in the autopsy. Moreover, our own examination of medi-

cal texts convinces us that the causes of subarachnoid hemorrhages are not yet completely understood by medical science. In this case, a competent pathologist searched for and found no evidence of a ruptured aneurysm; we feel under the circumstances that the jury could reasonably find beyond a reasonable doubt that the defendant caused the death of his wife.

Although we do not find any error in the admission of the expert medical testimony, we wish to comment on one of the aspects of the procedure followed. An officer of the Bureau of Criminal Apprehension was present at the autopsy conducted by the pathologist; defense counsel asked to attend the autopsy and this request was denied. While we find in the record no reason to believe defendant was prejudiced, we do observe that the better procedure under the circumstances of this case would have been to honor defense counsel's request to be present. Although the conduct of autopsies has not to our knowledge been abused by the sort of improper influences which led to the requirement of counsel at lineups, see, United States v. Wade, 388 U. S. 218, 87 S. Ct. 1926, 18 L. ed. 2d 1149 (1967), we feel that where the medical examiner requires or permits a representative of the prosecution to be present, attendance by defense counsel would help to maintain confidence in the integrity and impartiality of the medical findings.

Defendant also asserts error in the admission of a statement made by defendant at the time of arrest. When defendant was arrested at his father's home, the arresting officer informed him of his Miranda rights and defendant then indicated he did not wish to make a statement or answer questions until he had consulted an attorney. Despite his refusal to waive his right to remain silent, defendant was asked if he knew why he was being arrested. He replied, "Yes, my wife, is she dead?" This statement was introduced at trial over defendant's timely objection.

In Miranda v. Arizona, 384 U. S. 436, 86 S. Ct. 1602, 16 L. ed. 2d 694 (1966), the United States Supreme Court held that there can be no custodial interrogation of a suspect without a valid

waiver of his Fifth Amendment right to remain silent. The issue presented is whether defendant's statement was in reply to forbidden interrogation.

In several other jurisdictions, courts have admitted inculpatory statements which, although made without a proper waiver under Miranda, were elicited by questions required by the booking procedures. Such questions have been held not to "constitute an interrogation of the type contemplated by the court in Miranda. The questions were routine; were ordinarily addressed to every individual who was subject to the booking procedure; and were not intended to elicit answers which would incriminate the Appellant." Clarke v. State, 3 Md. App. 447, 451, 240 A. 2d 291, 294 (1968).[1]

The opposite rule was applied in Proctor v. United States, 131 App. D. C. 241, 242, 404 F. 2d 819, 820 (1968). Refusing to admit defendant's answers elicited by police in filling out a lineup sheet unless the prosecution could establish a valid waiver by the defendant of his right to remain silent, the court reasoned:

"At the outset, we hold that the questions which the arresting officer asked Proctor in the course of filling out the lineup sheet constituted in-custody interrogation. It may be that the officer asked these questions without any intent to elicit from Proctor a statement, damaging or otherwise, bearing on the crime with which he was charged. But the intent with which the questions were asked is not relevant here. Even innocent questions asked of a suspect in the inherently coercive atmosphere of the police station may create in him the impression that he must answer them. His answers then cannot be considered voluntary in the sense required by *Miranda*. Where such answers turn out to be damaging to the suspect, they cannot be used against him at trial, absent a valid waiver of the *Miranda* rights."

---

[1] See, also, People v. Rivera, 26 N. Y. 2d 304, 310 N. Y. S. 2d 287, 258 N. E. 2d 699 (1970); United States v. Sterling, 321 F. Supp. 1301 (E. D. La. 1971). Cf. Farley v. United States, 381 F. 2d 357 (5 Cir. 1967).

In deciding the instant case, however, we need not formally choose between the conflicting lines of authority. Without necessarily adopting the logic of the Clarke line of cases, we note that booking questions have value to the criminal process independent of any tendency to uncover admissions. The police have a legitimate interest in orderly records identifying the names, addresses, and places of employment of those arrested. We can find no legitimate purpose in *asking* defendant if he knew why he was being arrested. The state's reliance on Minn. St. 629.35, requiring an officer to inform the person arrested of the cause of the arrest, is entirely misplaced. By its terms, the statute contemplates *telling* the defendant the reason for his arrest rather than asking him if he knows the reason.

Although we agree that it was error to admit defendant's statement made at the time of arrest, we are convinced beyond a reasonable doubt that the error was harmless. It is undisputed that defendant knew of his wife's injuries, he knew she was taken to the ambulance, and he knew that her pulse was so weak others could not discern it. Moreover, a far more damning admission was properly admitted when defendant's stepson testified that he overheard defendant phone his mother and say, "She is dead, I must have hit her wrong." The challenged statement had little probative value, and any incriminating effect was merely corroborative of the statement made to defendant's mother. Cf. Jankord v. State, 290 Minn. 168, 186 N. W. 2d 530, certiorari denied, 404 U. S. 942, 92 S. Ct. 292, 30 L. ed. 2d 257 (1971).

Defendant also objects to the issuance of a search warrant by which certain evidence was seized because the affidavit in support of the warrant failed to state the sources of the affiant's beliefs. While normally this would be a fatal defect, State v. Pietraszewski, 285 Minn. 212, 172 N. W. 2d 758 (1969), we note that on the same day that the search warrant was issued the affiant appeared before the same judge seeking an arrest warrant. In the affidavit in support of the arrest warrant, the sources of the information constituting probable cause for the warrants

were given. Thus, we find that the judge did, in fact, know the sources of the information. While we consider it the better practice to put such information in the affidavit, "the primary concern is that the magistrate be sufficiently informed to make an independent determination, and not how he is so informed." State v. Burch, 284 Minn. 300, 307, 170 N. W. 2d 543, 549 (1969); State v. Campbell, 281 Minn. 1, 161 N. W. 2d 47 (1968).

Defendant's other assignments of error are without substance. The seizure of defendant's boots at the time of booking was a valid search and seizure incident to arrest. State v. Dill, 277 Minn. 40, 151 N. W. 2d 413 (1967); State v. Beltowski, 281 Minn. 28, 160 N. W. 2d 705, certiorari denied, 393 U. S. 988, 89 S. Ct. 468, 21 L. ed. 2d 450 (1968); Annotation, 19 A. L. R. 3d 727, 742.

Similarly, Dr. Fedor's testimony that the fatal bruise could have been caused by a blow from an object with the same configuration as defendant's boot did not improperly invade the province of the jury. "An expert may give his opinion if based upon a factual foundation supported by the evidence, even though it directly bears on the issue to be determined by the jury." Gardner v. Coca-Cola Bottling Co. 267 Minn. 505, 513, 127 N. W. 2d 557, 563 (1964); State v. McCarthy, 259 Minn. 24, 104 N. W. 2d 673 (1960); State v. Schwartz, 266 Minn. 104, 122 N. W. 2d 769 (1963).

Affirmed.