STATE of Minnesota, Respondent,

v.

Anthony Bernard HALE, Sr., Appellant.

No. CX–89–762.

Supreme Court of Minnesota.

April 13, 1990.

Rehearing Denied May 23, 1990.

Steven P. Russett, Asst. State Public Defender, St. Paul, for appellant.

James C. Backstrom, Dakota County Atty., Andrea G. White, Asst. County Atty., Hastings, for respondent.

COYNE, Justice.

Defendant was found guilty by the district court, sitting without a jury, of first degree premeditated murder in the brutal stabbing death of Vicky Shelton and was sentenced to life imprisonment. On this appeal from judgment of conviction he seeks a reduction of his conviction to first degree heat-of-passion manslaughter or a new trial. We affirm.

Defendant lived with the victim, Shelton, in her apartment in Eagan and is the father of her two children. On the afternoon of Tuesday, September 6, 1988, neighbors of Shelton became suspicious when they found Shelton's two-year-old son playing unattended on her patio, saw blood on the apartment curtains, and heard the telephone ringing continuously. Entering through an unlocked door, which was slightly ajar, they found Shelton's dead body on the floor of the master bedroom near a crib where Shelton's three-month-old son was sleeping.

Police found three large butcher knives and a carving fork in the bedroom. One knife, the handle of which was found on the dresser, had broken off inside Shelton. Another knife and carving fork were bent and covered with blood. The autopsy revealed that Shelton had been stabbed 14 times. Each of a minimum of four of the stab wounds could have caused her death. There were also signs of attempted strangulation (a robe sash was wound around her neck and an electric cord was lying next to the body) and signs that Shelton had been beaten about the head with a metal coat rack. Wounds on her hands indicated that she had attempted to defend herself against the brutal attack.

Police suspicion immediately focused on defendant, who was linked to the murder scene by two neighbors (and, as it later developed, by scientific evidence linking him to fingerprints, palmprints, a footprint and blood stains found at the scene). Defendant turned himself in to St. Paul police early the next morning. Shortly after being booked defendant asked about his children and was told that they were in a shelter. Defendant became teary-eyed, said he recalled fighting with Shelton and asked when she died. He was told to save his questions for the Eagan police. Although defendant did not appear to be intoxicated, he did appear depressed.

Later two Eagan police officers met with defendant in a conference room and gave him a *Miranda* warning. They then transported him to the Eagan Police Department, where defendant formally and in writing acknowledged and waived his rights, then gave a 30–minute statement in which he confessed to hitting and "cutting" Shelton. That afternoon he gave another statement in which he provided more details concerning the incident.

Testifying in his own defense at trial, defendant claimed he had returned to the apartment in an intoxicated condition after consuming marijuana, cocaine, Ativan (a prescription tranquilizer), and whiskey. He testified that an argument ensued after Shelton criticized him for using drugs. He claimed she grabbed a knife after he "smacked" her and that he cut his hand while wrestling it from her. He testified that he remembered hitting and "cutting" her but could not remember stabbing her with the fork, breaking a knife blade inside her, hitting her with the coat rack, or strangling her. He admitted that he ignored Shelton's request that he take her to a hospital. He claimed he panicked, changed his bloody clothes, and fled with companions who he said were waiting outside.

Defendant's first contention is that his conviction should be reduced from first degree premeditated murder to first degree heat-of-passion manslaughter. In support, he argues that the evidence showed he was so intoxicated as to be incapable of forming any intent to kill or of acting with premeditation. He argues also that there was ample provocation to cause a reasonable person under like circumstances to lose his self-control and kill in the heat-of-passion. We believe that the evidence of premeditation and of intent to kill was sufficient and we are not persuaded by either of defendant's arguments.

Minnesota Statutes § 609.075 (1988) provides in relevant part that "when a par-

ticular intent or other state of mind is a necessary element to constitute a particular crime, the fact of intoxication *may* be taken into consideration in determining such intent or state of mind." (Emphasis added). The use of the permissive "may" suggests that the defendant's intoxication is but one of the facts that the fact finder, usually the jury but in this case the trial court, is free to consider in deciding whether the defendant had the requisite specific intent. We have never held that the mere fact that the defendant was intoxicated means that he was incapable of forming the requisite intent. Indeed, in numerous cases we have affirmed convictions for crimes committed by defendants while their blood alcohol levels were very high. *See, e.g., State v. Olson,* 298 Minn. 551, 552, 214 N.W.2d 777, 778 (1974); *State v. Bonga,* 278 Minn. 181, 186, 153 N.W.2d 127, 130 (1967). Here the defendant presented evidence that he was intoxicated when he killed the victim. There was other evidence, however, suggesting that petitioner was not intoxicated. The trial court, as fact finder, was free to credit or not to credit the evidence of intoxication. If the trial court credited the evidence, the court was free to give it whatever weight it felt the evidence deserved. The evidence certainly does not compel the conclusion that defendant was incapable of forming the requisite specific intent to kill or of premeditating the victim's death.

■ Similarly, we reject defendant's argument that the victim's alleged insults and threats, taken in context, were sufficient to provoke a person of ordinary self-control under like circumstances to kill her. Even if we were to assume that the trial court as fact finder credited all of petitioner's testimony about what the victim said and did, we cannot hold that the evidence forces the conclusion that petitioner killed in the heat-of-passion. As the trial court said, "The words or acts in this case are not the type of words or acts the Legislature could have intended would provoke a person of ordinary self-control to act in the 'heat-of-passion.'"

Defendant's other main contention is that he should be given a new trial because the trial court erred in admitting statements he made to police during custodial interrogation. Defendant first argues that certain statements he made to St. Paul police at the time he was booked were in response to custodial interrogation by the police before he was given a *Miranda* warning. Second, defendant argues that his recorded statements to the Eagan police officers who questioned him after giving him a *Miranda* warning were "involuntary" and therefore inadmissible. Third, he argues that at one point during the second interrogation by Eagan police he invoked his right to counsel under *Miranda* and that therefore any subsequent statements made in response to custodial interrogation should have been suppressed. We reject all three arguments.

■ Defendant made two statements to St. Paul police after being arrested. The first, in which he explained a cut on his finger by saying he "got bit," was in response to a routine booking question. Routine booking questions are exempt from *Miranda* requirements. *State v. Widell,* 258 N.W.2d 795, 797 (Minn.1977); *see also Rhode Island v. Innis,* 446 U.S. 291, 300–02, 100 S.Ct. 1682, 1689–90, 64 L.Ed.2d 297 (1980) (not custodial interrogation). The other statement, made when the officer answered defendant's question about his children's welfare, was a spontaneous, volunteered statement not made in response to "interrogation." *Innis,* 446 U.S. at 300–02, 100 S.Ct. at 1689–90.

■ We have no difficulty in rejecting defendant's argument that his statements to the Eagan police were "involuntary." Defendant's will was not overborne by the police and his statements clearly were the product of a rational intellect and free will. *Colorado v. Connelly,* 479 U.S. 157, 170, 107 S.Ct. 515, 523–24, 93 L.Ed.2d 473 (1986).

■ Defendant's third argument with respect to his statements to the police relates to the second of his formal statements, the statement defendant made in the afternoon. Before resuming questioning of defendant the police showed defendant a copy of the waiver he had signed

earlier in the day, and defendant said that he was still willing to talk with the police.[1] Several minutes into the afternoon interrogation, the questioning turned to defendant's state of mind during the incident with the victim:

Q: Were you mad, Anthony? Were [you] angry about something?

A: Um.

Q: You were mad.

A: I wasn't, I wasn't, ya know like, I don't think I had no attitude at her at all, I don't know what, I don't know what could of made me snap. I mean ya know, like I ...

Q: But you did snap, right?

A: I, uh, uh, uh, apparently, yes its obvious that I did. I mean ya know, like, I'm just saying this here, ya know like, *I know I'm in some trouble like, I'm just going to need me a good lawyer,* ya know, I, I really me and this girl ya know, we have been through a dozen rounds, ya know like, ya know I've slapped her and she hit me with stuff before, ya know like, damn, I mean, ya know I just, I never did think I would do no shit, I mean ya know.

Q: Have you ever, had you ever thought about killing her before? Ever talked about it?

A: No, no.

(Emphasis added). Defendant argues that when he said "I'm just going to need me a good lawyer," the police should have ceased interrogating him further about the offense and limited their questions to determining whether defendant was requesting counsel. We disagree.

The United States Supreme Court has twice declined to resolve the issue of what standards govern the determination of whether equivocal statements constitute invocation of the *Miranda* right to counsel. *Connecticut v. Barrett,* 479 U.S. 523, 529 n. 3, 107 S.Ct. 828, 832 n. 3, 93 L.Ed.2d 920 (1987); *Smith v. Illinois,* 469 U.S. 91, 99–100, 105 S.Ct. 490, 494–95, 83 L.Ed.2d 488 (1984). In this vacuum we held in *State v. Robinson,* 427 N.W.2d 217, 223 (Minn. 1988), that if a suspect's equivocal reference to counsel arguably may be considered to be a request for counsel, then further interrogation must cease until the police have clarified the earlier comment to determine whether the suspect truly wants counsel before submitting to further interrogation. Other courts following the *Robinson* approach have held that not every mention of the word "lawyer" or "counsel" or "attorney" by a suspect "arguably" suggests that the suspect wants a lawyer before submitting to further questioning. *See, e.g., Bruni v. Lewis,* 847 F.2d 561, 564 (9th Cir.1988), *cert. denied,* —— U.S. ——, 109 S.Ct. 1319, 103 L.Ed.2d 587 (1989); *United States v. Jardina,* 747 F.2d 945, 949 (5th Cir.1984), *cert. denied,* 470 U.S. 1058, 105 S.Ct. 1773, 84 L.Ed.2d 833 (1985). In this case the defendant made a fleeting, off-hand comment in mid-sentence about his future need for a good attorney in defending himself against the charges which were sure to follow. His comment was not even arguably an invocation of his *Miranda* right to counsel. Although we conclude that the further interrogation of defendant was not in violation of our decision in *Robinson,* which we here reaffirm, we nonetheless add that if there was any error in further interrogating defendant and in admitting the statements that he made in response to such interrogation, the error clearly was harmless error beyond a reasonable doubt. *See Robinson,* 427 N.W.2d at 224–26.

Other issues raised by defendant, including issues raised by him in his pro se supplemental brief (effectiveness of counsel and propriety of the grand jury proceeding) do not merit discussion.

Affirmed.

---

**1.** We find no fault with the police for this. Although prudent police officers will perhaps choose to give a defendant another *Miranda* warning before resuming custodial interrogation of a suspect, it is not necessary as a matter of law to do so unless circumstances have changed in some significant way. *Wyrick v. Fields,* 459 U.S. 42, 47, 103 S.Ct. 394, 396, 74 L.Ed.2d 214 (1982). Nothing in the record here suggests such a change in circumstances.