**STATE of Minnesota, Respondent,**

v.

**Iris Janeth MALDONADO–ARREAGA, Appellant.**

**No. A08–1750.**

Court of Appeals of Minnesota.

Sept. 15, 2009.

Lori Swanson, Attorney General, St. Paul, MN; and Boyd Beccue, Kandiyohi County Attorney, John Kallestad, Assistant County Attorney, Willmar, MN, for respondent.

Marie Wolf, Interim Chief Public Defender, Sharon E. Jacks, Assistant Public Defender, St. Paul, MN, for appellant.

Considered and decided by KLAPHAKE, Presiding Judge; STAUBER, Judge; and MUEHLBERG, Judge.

## O P I N I O N

MUEHLBERG, Judge.*

Appellant challenges her convictions of aggravated forgery and identity theft, arguing that the district court erred in denying her motion to suppress (1) biographical information she provided federal immigration and customs enforcement (ICE) agents subsequent to a warrantless raid of her home, a warrantless detention, and non-*Mirandized* custodial interrogation; and (2) additional evidence that a Willmar police detective acquired in an investigation following receipt of the information from ICE. Because the district court erred in concluding that the biographical evidence was not subject to the exclusionary rule, we reverse.

---

* Retired judge of the district court, serving as judge of the Minnesota Court of Appeals by appointment pursuant to Minn. Const. art. VI, § 10.

## FACTS

In April 2007, at approximately 5:30 a.m., ICE agents knocked on the door of appellant Iris Janeth Maldonado–Arreaga's home in search of persons in the country illegally. The agents entered appellant's home without permission, exigency, or a search warrant. Appellant testified that: as she opened the door, armed agents pushed their way in and began searching the residence; waking three of her children, she was handcuffed on her bed next to her nursing baby, who was sleeping; she was questioned as to the whereabouts of her twenty-year-old son; she was forced to drive the agents to her son's residence using her car; and, after returning to her residence, she was questioned as to her identity. Without being provided a *Miranda* warning, appellant informed the agents of her name, address, and birth date. She provided other information, including that (1) she is a citizen of Honduras; (2) she was an employee of Jennie–O; (3) she had used the alias Sonia Reyes Acosta; and (4) she paid a smuggler $6,000 to obtain entry into the United States. The agents filled out a standard ICE I–213 form containing this information.

Later, ICE provided a copy of the form to a Willmar police detective. Based solely on the information on the form, the detective contacted Jennie–O and the Minnesota Department of Public Safety (DPS) and learned that appellant used the alias on her employment application, I–9 employment-eligibility form, and her IRS W–4 form and to obtain a social security card and driver's license. Appellant was charged with a number of offenses related to using the alias.

After appellant moved to suppress the information found in the I–213 form and obtained from Jennie–O and DPS, the district court determined that the warrantless raid and detention and non-*Mirandized* custodial interrogation which led to the information on the form were unconstitutional for the purposes of criminal prosecution. Even so, because most of the information on the I–213 form was biographical, the district court held that it could not suppress the information under an exception to the *Miranda* requirement and denied appellant's motion.[1] The district court's memorandum accompanying its order makes clear that the district court based its decision exclusively on Minnesota case law pertaining to the Fifth Amendment and not on cases interpreting the Fourth Amendment or other post-*Miranda* decisions of the United States Supreme Court.

Appellant waived her jury trial rights, and the parties agreed to submit the prosecutor's evidence to the district court in a stipulated-evidence trial as provided by Minn. R.Crim. P. 26.01, subd. 4. After the district court considered the stipulated evidence, it found appellant guilty of aggravated forgery and identity theft. The district court sentenced her to 90 days in jail for the theft, stayed imposition of a sentence for the forgery charge, and placed her on probation for five years. This appeal follows.

## ISSUES

I. Did the district court err in determining that, in a criminal case, the exclusionary rule does not apply to biographical information?

II. Should the information obtained in violation of appellant's constitutional rights be suppressed?

III. Should the evidence obtained by the Willmar detective, including the evi-

---

**1.** The district court suppressed her reference     to paying a smuggler to enter the country.

dence obtained from Jennie–O and DPS, be suppressed as fruit of the poisonous tree?

## ANALYSIS

### I.

The first issue is whether the district court erred in determining that the exclusionary rule does not apply to biographical information in a criminal case. There is no dispute that, in a criminal law context, the ICE agents' search, seizure, and interrogation of appellant were unconstitutional. The parties' dispute is whether the type of information on the I–213 form is subject to the exclusionary rule.

■ The United States and Minnesota constitutions prohibit unreasonable searches and seizures and protect persons from compelled self-incrimination. U.S. Const. Amends. IV, V; Minn. Const. art. I, §§ 7, 10. The exclusionary rule provides that evidence seized in violation of the constitution generally must be suppressed. *State v. Jackson*, 742 N.W.2d 163, 178 (Minn.2007). Whether the exclusionary rule prohibits the admission of evidence in a particular case is a question of law, which we review de novo. *State v. Askerooth*, 681 N.W.2d 353, 359 (Minn.2004). When reviewing a pretrial order denying a motion to suppress, we may independently review the facts and determine whether, as a matter of law, the district court erred in not suppressing the evidence. *Id.*

■ In its memorandum, the district court concluded that biographical information cannot be suppressed, even when the information is obtained after an unlawful search, seizure, and interrogation. In support of its conclusion, the district court cited *State v. Widell*, 258 N.W.2d 795, 797 (Minn.1977); *State v. Link*, 289 N.W.2d 102 (Minn.1979); and *State v. Hale*, 453 N.W.2d 704 (Minn.1990). These cases pertain exclusively to facts involving the relationship between the Fifth Amendment as interpreted by *Miranda*[2] and post-arrest booking questions.

In *Widell*, the supreme court was asked to determine whether "routine booking questions relating to name and address or similar matters must be preceded by a *Miranda* warning." 258 N.W.2d at 797. The court stated that " 'booking questions have value to the criminal process independent of any tendency to uncover admissions' and that 'police have a legitimate interest in orderly records identifying the names, addresses, and places of employment of those arrested.' " *Id.* (quoting *State v. Smith*, 295 Minn. 65, 69, 203 N.W.2d 348, 351 (1972)). It held that "*Miranda* warnings need not be given before asking routine booking questions." *Id.*

Two years later in *Link*, after the defendant was lawfully arrested and administered a *Miranda* warning, she told the arresting officer that she did not want to talk. 289 N.W.2d at 107. At the police station, she was asked "biographical questions and innocuous questions about the care of her baby and about a black Cadillac circling the police car." *Id.* The

---

2. Under the Fifth Amendment to the United States Constitution and article 1, section 7 of the Minnesota Constitution, as interpreted in *Miranda v. Arizona*,

because of the coercion inherent in custodial interrogation, a criminal suspect must be warned prior to any questioning that he has the right to remain silent, that anything he says can be used against him in a court of

law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior or to any questioning if he so desires.

*State v. Farrah*, 735 N.W.2d 336, 340 (Minn. 2007) (footnote omitted) (quoting *Miranda v. Arizona*, 384 U.S. 436, 479, 86 S.Ct. 1602, 1630, 16 L.Ed.2d 694 (1966)).

defendant challenged the propriety of the questioning under the Fifth Amendment. *Id.* at 106. The court, relying exclusively on *Widell,* stated that the questioning after the *Miranda* warning was not unconstitutional because "[b]iographical questions are not proscribed by *Miranda* " and because "[q]uestions about the baby and [the car] had nothing to do with investigating criminal activity, but were necessary to safely taking Link and her child into custody." *Id.* at 107.

In *Hale,* the defendant, while being booked and before receiving a *Miranda* warning, responded to a "routine booking question" about a cut on his finger by explaining that he "got bit." 453 N.W.2d at 706–07. The defendant argued that his answer should be suppressed because he was not issued a *Miranda* warning before making the statement. *Id.* at 707. The supreme court rejected his argument and, relying on *Widell* and *Rhode Island v. Innis,* 446 U.S. 291, 300–02, 100 S.Ct. 1682, 1689–90, 64 L.Ed.2d 297 (1980), stated that "[r]outine booking questions are exempt from *Miranda* requirements." *Id.*

After our review, it is clear that *Widell, Link,* and *Hale* do not support the district court's broad legal conclusion because in regard to the Fourth Amendment, they are inapposite. These cases do not even purport to pertain to the Fourth Amendment's search-and-seizure concerns, do not discuss the exclusionary rule as it pertains to the Fourth Amendment, and do not state holdings that apply to biographical information provided after an illegal search and seizure. Instead they address routine booking questions-questions not intended or expected to produce incriminating admissions-at a police station following a lawful detention, the value of which is

orderly recordkeeping. In striking contrast, appellant was interrogated while handcuffed in her home after a warrantless raid by federal agents, agents who clearly intended to uncover incriminating evidence from appellant about her status as a legal resident. The district court's application of this case law to appellant's case is erroneous.

To resolve this issue, it is helpful to address *INS v. Lopez–Mendoza,* 468 U.S. 1032, 104 S.Ct. 3479, 82 L.Ed.2d 778 (1984). In *Lopez–Mendoza,* the Supreme Court reviewed two deportation cases that took place following unlawful arrests. One appellant challenged an immigration court's *jurisdiction* over his person, but did not object to the admission of evidence offered against him. 468 U.S. at 1040, 104 S.Ct. at 3484. In contrast, the other appellant did not object to jurisdiction, but rather to the *evidence* offered against him. *Id.* In the jurisdictional challenge, the Court said that the " 'body' or identity of a defendant or respondent in a criminal or civil proceeding is never itself suppressible as a fruit of an unlawful arrest." *Id.* at 1039, 104 S.Ct. at 3483. The Court, however, addressed the evidentiary issue differently. The Court acknowledged the "general rule in a criminal proceeding is that statements and other evidence obtained as a result of an unlawful, warrantless arrest *are suppressible* if the link between the evidence and the unlawful conduct is *not too attenuated.*" *Id.* at 1040–41, 104 S.Ct. at 3484 (emphasis added). It is clear from this analysis that the Court's reference to the suppression of identity appears relevant only to a jurisdictional issue, not to an evidentiary issue.[3] Here, the issue is evidentiary.

---

3. This distinction between jurisdictional and evidentiary challenges has been discussed in several recent circuit court decisions. *See,*  e.g., *United States v. Olivares–Rangel,* 458 F.3d 1104, 1111 (10th Cir.2006); *United States v. Perez–Perez,* 337 F.3d 990, 994 (8th Cir.2003).

The federal circuits have taken different approaches to how *Lopez–Mendoza* relates to challenges to biographical/identity evidence in criminal proceedings. *See United States v. Guevara–Martinez*, 262 F.3d 751, 753–54 (8th Cir.2001) (discussing Fifth, Eighth, and Ninth Circuit cases). The most persuasive discussion is found in *Guevara–Martinez*. There, appellant was fingerprinted after an illegal traffic stop, and subsequently charged with being an illegal alien found in the United States after deportation. *Id.* at 752. He moved to suppress fingerprint evidence as well as statements he made about his identity, and the government opposed the motion by relying on the same language from *Lopez–Mendoza* identified by respondent in this case. *Id.* After reviewing *Lopez–Mendoza* and the interpretations of it by the various circuit courts, the *Guevara–Martinez* court concluded that *Lopez–Mendoza's* statement about the suppression of identity did not apply to biographical evidence, such as fingerprint evidence challenged in a criminal proceeding. *Id.* at 754–55. Rather than apply a broad biographical-information exception to the exclusionary rule, the court addressed the admissibility of the evidence under traditional Fourth Amendment case law. *Id.* at 755. Specifically, the court determined that, under long-accepted Supreme Court precedent, the exclusionary rule may be applied to fingerprint and other biographical evidence obtained as the result of unlawful arrests and detentions. *Id.* at 755 (discussing *Hayes v. Florida*, 470 U.S. 811, 105 S.Ct. 1643, 84 L.Ed.2d 705 (1985) and *Davis v. Mississippi*, 394 U.S. 721, 89 S.Ct. 1394, 22 L.Ed.2d 676 (1969)).

Coming to the same conclusion, the Tenth Circuit interpreted *Lopez–Mendoza* and stated that

> the Supreme Court's statement that the 'body' or identity of a defendant are 'never suppressible' applies only to cases in which the defendant challenges the jurisdiction of the court over him or her based upon the unconstitutional arrest, not to cases in which the defendant only challenges the admissibility of the identity-related evidence.
>
> A defendant may still seek suppression of specific pieces of evidence (such as, say, fingerprints or statements) under the ordinary rules announced in [*Mapp v. Ohio*, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961)] and [*Wong Sun v. United States*, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963)]. A broader reading of *Lopez–Mendoza* would give the police carte blanche powers to engage in any manner of unconstitutional conduct so long as their purpose was limited to establishing a defendant's identity.

*United States v. Olivares–Rangel*, 458 F.3d 1104, 1111 (10th Cir.2006).

■ ▪We find this authority persuasive, and we conclude that there is no general principle that biographical information is exempt from the exclusionary rule. As such, the district court erred as a matter of law.[4] We hold that when biographical evidence is obtained through unconstitutional governmental action and a party challenges the admissibility of the evidence, the exclusionary rule applies.

**II.**

■ The second issue is whether the challenged biographical information on the

---

**4.** We add that *Guevara–Martinez* has been reaffirmed or recognized several times by the Eighth Circuit. *See, e.g., United States v. Flores–Sandoval*, 422 F.3d 711, 715 (8th Cir. 2005); *United States v. Perez–Perez*, 337 F.3d 990, 994 (8th Cir.2003); *United States v. Rodriguez–Arreola*, 270 F.3d 611, 618–19 (8th Cir. 2001).

I–213 form should be suppressed after ICE agents acquired the information from appellant in violation of her constitutional rights. As previously stated, evidence seized in violation of the constitution generally must be suppressed, and questions related to whether evidence should be excluded under the exclusionary rule are reviewed de novo. *Jackson,* 742 N.W.2d at 178; *Askerooth,* 681 N.W.2d at 359. It is undisputed that the ICE agents' search, seizure, and interrogation were unconstitutional for the purposes of criminal law. Indeed, these constitutional violations were flagrant and egregious.

■ In determining whether evidence is "fruit" of an unlawful search and must be suppressed under the exclusionary rule, we examine "whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint." *Knapp v. Comm'r of Pub. Safety,* 610 N.W.2d 625, 628 (Minn.2000) (quotation omitted); *see also Wong Sun,* 371 U.S. at 488, 83 S.Ct. at 407. The examination requires an analysis of factors including "the purpose and flagrancy of the misconduct, the presence of intervening circumstances, whether it is likely that the evidence would have been obtained in the absence of the illegality and the temporal proximity of the illegality and the evidence alleged to be the fruit of the illegality." *Id.* (quotation omitted); *see also State v. Weekes,* 312 Minn. 1, 9, 250 N.W.2d 590, 595 (1977) (analyzing the factors to consider in determining admissibility of confessions obtained following an illegal arrest).

In appellant's case, the ICE agents obtained the biographical information immediately after they unlawfully raided her house, seized her, and interrogated her.

The ICE agents are solely responsible for the illegalities, and their activity is the sole source of the information on the I–213 form. Consequently, there is *no* gap between the illegal conduct and the procurement of the challenged evidence. Of course, it was a Willmar police detective—not the ICE agents—who conducted the investigation which led to the charges in this case, and appellant does not accuse the detective of any impropriety. The information on the I–213 form, however, was not obtained by the detective. Because there is no gap between the unconstitutional conduct and the information on the I–213 form, we conclude that the information on the I–213 form must be suppressed.

### III.

■ The third issue is whether the evidence obtained by the Willmar detective, including the evidence obtained from Jennie–O and DPS, should be suppressed as fruit of the poisonous tree. As discussed above, to determine whether this evidence must be suppressed under the exclusionary rule, we examine whether this evidence "has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint," which requires an examination of "the purpose and flagrancy of the misconduct, the presence of intervening circumstances, whether it is likely that the evidence would have been obtained in the absence of the illegality and the temporal proximity of the illegality and the evidence alleged to be the fruit of the illegality." *Knapp,* 610 N.W.2d at 628 (quotation omitted); *see State v. Bergerson,* 659 N.W.2d 791, 799 (Minn.App.2003) (holding that evidence discovered by officers following unconstitutional conduct was inadmissible because it was unlikely the officers would have discovered the evidence absent their egregious conduct).

Regarding this derivative evidence, respondent's position is that any taint from the ICE agents' conduct had dissipated to the point that the deterrent effect of the exclusionary rule would no longer be justified, arguing that the six-day time difference between the ICE agents' misconduct and the beginning of the detective's investigation is significant. The record, however, reflects that the detective's investigation began on the same day he received the I–213 form from ICE.

Here, the ICE agents' misconduct was flagrant and egregious, there were no intervening circumstances between the detective's receipt of the I–213 form and the commencement of his investigation which led to the I–9 form and driver's license information, there is no claim that this derivative evidence would have been obtained in the absence of the ICE agents' conduct, and the evidence was obtained soon after the detective received the illegally-obtained I–213 form. Even though there is no accusation that the detective directly participated in the ICE raid,[5] the evidence that prompted his investigation and connected the I–9 form and the driver's license to illegal activity was a direct product of ICE's illegal acts. The district court acknowledged this connection by stating that, if the I–213 form were not suppressed, "[the] evidence discovered as a result of that information would be fruit of the poisonous tree, and thus also be suppressed." Respondent concedes that the detective obtained the evidence "using *only* the information contained on [the form obtained by ICE agents]." In consequence, there is no attenuation of the taint

created by the ICE agents' unconstitutional acts, and, as a result, we hold that the evidence uncovered by the detective must be suppressed as fruit of the poisonous tree.

Appellant raises additional issues on appeal, including whether coercion is an alternative basis for suppressing evidence in this case. Because this case is resolvable on the issues discussed above, we do not review these issues.

## DECISION

Because the district court erred in concluding that the biographical evidence was not subject to the exclusionary rule and because we hold that the evidence in this case must be suppressed, we reverse.

**Reversed.**

---

**5.** Appellant does not claim that the detective was directly involved in the ICE raids. Yet, at oral argument, respondent conceded that members of the Willmar Police Department, including this detective, were in contact with ICE prior to the raid on appellant's residence, assisted ICE in coordinating unconstitutional raids on Willmar residents, and were present as "observers" during some of the raids. Clearly, the ICE raids did not occur in a vacuum, and the local police's participation— even if described as moderate, passive, or idle—is regrettable.