ROSS, Judge
Minneapolis Police officers following a car for turning without signaling believed that one of its passengers-appellant Corey Davis Jr.-had gotten out. An officer, who found it suspicious that Davis looked toward him and then looked away before turning to walk away, exited his squad car, approached Davis, grabbed him by the arm, handcuffed him, and began questioning him. After Davis commented about possessing drugs and being impaired from a previous gunshot injury, officers searched the area and discovered a handgun that they surmised Davis had tossed away. Davis was charged with and convicted of unlawful possession of a firearm. Because the officer had no reasonable suspicion to stop and detain Davis, and because the officers exploited the stop and Davis's incriminating comments to decide to search the area, the district court should have applied the fruit-of-the-poisonous-tree doctrine and suppressed evidence of the handgun. We therefore reverse Davis's conviction and remand.
*53 FACTS
Police officers Brandon Bartholomew and Brandy Steberg were patrolling in north Minneapolis on a May 2015 morning when they saw a Chevy Tahoe about two blocks ahead of them turn without signaling. The officers momentarily lost sight of the Tahoe, and when they saw it again, it was pulling away from a curb. They saw a man, whom they later identified as Corey Davis Jr., standing in a yard. Officer Bartholomew deduced that Davis had been a passenger in the Tahoe. He saw Davis "look[ ] away from" the officers "very quickly, and also start[ ] walking very quickly away."
Officer Bartholomew exited the squad car, and Officer Steberg continued to follow the Tahoe. Officer Bartholomew told Davis to stop. He then grabbed Davis by the arm, handcuffed him, and ordered him to sit on the curb as he questioned him. Davis said that a previous gunshot injury made it hard for him to bend his leg. He also said "that he had marijuana on him and that he had eaten it." And he suggested that he was the subject of arrest warrants.
Officer Steberg eventually returned, and the two officers searched the area where they had first seen Davis standing. Officer Steberg found a .38 caliber handgun in a bush. Davis's fingerprints were on the gun, and the state charged him with possessing a firearm as an ineligible person.
Davis challenged the constitutionality of the stop and moved the district court to suppress the evidence. The district court held that Officer Bartholomew lacked reasonable suspicion that Davis had committed any crime, and it therefore suppressed Davis's statements made during his illegal detention. But it denied Davis's motion to suppress evidence of the handgun, finding that the officers' decision to search the area rested on reasons other than Davis's statements.
A jury found Davis guilty. This appeal follows.
ISSUES
I. Did the district court clearly err by finding that the officer did not base his decision to search the area on information he obtained while he unconstitutionally detained Davis?
II. Should evidence of the handgun have been suppressed as fruit of the unconstitutional stop and detention?
III. Does evidence of the handgun avoid exclusion under the fruit-of-the-poisonous-tree doctrine because Davis allegedly abandoned the handgun before the unconstitutional stop?
ANALYSIS
Davis appeals from his conviction by challenging the district court's pretrial denial of his motion to suppress evidence of the handgun. We review the district court's pretrial fact-findings for clear error. State v. Ortega , 770 N.W.2d 145, 149 (Minn. 2009). We review de novo the district court's holdings on the constitutionality of a search and seizure. State v. Anderson , 733 N.W.2d 128, 136 (Minn. 2007).
The state does not contest the district court's holding that Officer Bartholomew's stop violated Davis's constitutional rights. The state's concession is well founded. The United States and Minnesota Constitutions prohibit unreasonable searches and seizures. U.S. Const. amend. IV ; Minn. Const. art. I, § 10. A police officer may stop and detain a person as part of a criminal investigation without a warrant only if the officer can identify specific and articulable facts that create a reasonable suspicion of illegal activity.
*54 Terry v. Ohio , 392 U.S. 1, 21, 88 S.Ct. 1868, 1880, 20 L.Ed.2d 889 (1968) ; State v. Britton , 604 N.W.2d 84, 87 (Minn. 2000). By contrast, an officer may not stop a person based on "mere whim, caprice, or idle curiosity." Marben v. State, Dep't. of Pub. Safety , 294 N.W.2d 697, 699 (Minn. 1980) (quotation omitted). One of the officers supposed that Davis had just left a car driven by a person who failed to properly signal a turn. That Davis acted in a manner that implied that he did not want to interact with the officers supports nothing more than a hunch, a mere whim, or a guess that Davis had violated or was about to violate some law. We emphasize that the officer's action did not resemble the events considered in United States Supreme Court caselaw holding that a person's unprovoked flight from police in an area of heavy narcotics trafficking may be "a pertinent factor in determining reasonable suspicion." Illinois v. Wardlow , 528 U.S. 119, 124, 120 S.Ct. 673, 676, 145 L.Ed.2d 570 (2000). The officer's explanation here fell far short of constituting specific and articulable facts that create a reasonable suspicion of illegal activity, and the district court therefore correctly held the stop unconstitutional.
Based on the unconstitutional stop, Davis challenges the district court's decision to allow evidence of the handgun during his trial. Evidence that "would not have come to light" but for police exploitation of their illegal actions is generally deemed "fruit of the poisonous tree" and excluded from the state's use at trial. Wong Sun v. United States , 371 U.S. 471, 487-88, 83 S.Ct. 407, 417, 9 L.Ed.2d 441 (1963). "Evidence obtained through an illegal seizure is inadmissible to support a conviction." State v. Bergerson , 659 N.W.2d 791, 797 (Minn.App. 2003). We must decide whether the district court properly concluded that the handgun is not fruit of the poisonous tree.
I
Before we can decide whether, on the facts of this case, the district court properly concluded that the handgun is not fruit of the poisonous tree, we must consider whether the evidence supports the facts relied on by the district court. Davis challenges the validity of the district court's findings that "Officers Bartholomew and Steberg learned no new information as a result of seizing the defendant that caused them to search the area" and that "[i]nstead, the decision to search the area was made based on the defendant's evasive conduct prior to being stopped." Applying our clear-error review standard to these findings, Ortega , 770 N.W.2d at 149, we conclude that we cannot rely on them. We have looked to the record for evidence supporting the findings, but the record reveals only this contrary testimony from Officer Bartholomew:
Prosecutor: Did he say anything to you other than saying that he couldn't sit down?
Officer Bartholomew: He did make an utterance to the effect that he had marijuana on him and that he had eaten it prior to being stopped, and he also stated that he thought he had some warrants.
Prosecutor: So, what did you do at this point?
Officer Bartholomew: Well, at that point I was suspicious that something may have been tossed, hidden somewhere in the area.
Officer Bartholomew was asked particularly about that "point" in the encounter after he had stopped Davis and after he heard Davis's responses disclosing his prior gunshot injury, his drug possession, and his pending arrest warrants. The officer's statement, "at that point I was suspicious *55 that something may have been tossed," followed just after he recounted that Davis told him that he tried to hide drugs moments before the seizure. This context undermines the district court's finding that the officers "learned no new information" from the illegal seizure that caused them to search the area near Davis. The state directs us to no evidence, and we have found none in the record, that supports the district court's other finding that "the decision to search the area was made based on the defendant's evasive conduct prior to being stopped."
The state accurately points out that Officer Bartholomew did testify about Davis's seemingly evasive eye-contact and his beginning to walk away. But he offered this testimony to justify approaching and stopping Davis. The officer never suggested that he decided to search the area based on this pre-seizure conduct or that Davis's incriminating statements had no influence on his decision to search the area. Despite our deference to the district court's fact-finding role, we see no evidence supporting the challenged findings, and we see only evidence that contradicts the findings. We hold that the district court clearly erred by finding that the officers made the decision to search the area before Officer Bartholomew stopped Davis and that the officers learned nothing after the stop to cause them to conduct the search. The record supports only one finding, which is that Officer Bartholomew decided to search the area based in part, if not entirely, on what he learned as a consequence of his illegal stop.
II
We next consider de novo whether evidence of the handgun was fruit of the poisonous tree given that Officer Bartholomew chose to search based on Davis's statements during the stop. Several factors guide our poisonous-tree assessment, "including the temporal proximity of the illegality and the evidence alleged to be the fruit of that illegality, the presence of intervening circumstances, the purpose and flagrancy of the misconduct, and whether it is likely that the evidence would have been obtained in the absence of the illegality." State v. Sickels , 275 N.W.2d 809, 814 (Minn. 1979). None of these factors alone is dispositive. State v. Weekes , 268 N.W.2d 705, 709 (Minn. 1978). They all suggest that the handgun is fruit of the illegal stop.
The first factor, the temporal proximity between the illegal detention and the gun's discovery, is not precisely stated in the record. But the evidence indicates a nearly immediate proximity between the officer's information gathering during the illegal detention and his suspicion that led to the search. Regarding the second factor, no circumstance intervened between the detention itself and the search, except for the officer's questioning and Davis's incriminating comments, which the district court appropriately suppressed.
As for the third factor-the flagrancy of the police misconduct-we conclude that the police behavior was blatantly offensive. A passenger leaves a car whose driver failed to signal a turn, and the passenger is then grabbed by the arm, handcuffed, and ordered to the curb for police questioning in a residential neighborhood in broad daylight? All because, according to the officer, it appeared as though the person wanted to avoid interacting with police? This humiliating behavior is so obviously inconsistent with what the Fourth Amendment demands that we have no difficulty declaring it to be a flagrant affront to constitutional policing.
The final factor, whether police would have discovered the evidence without the illegal stop, also argues in favor of treating the handgun as fruit of the poisonous tree.
*56 Police found the gun in a bush and not in plain view, so the search was necessary to its discovery. We have no reason to assume that police customarily search the area whenever passengers leave cars being driven by turn-signal violators-even passengers who seem to want to avoid police contact. We have already determined that the officer's testimony establishes that he based his decision to search on what he heard from Davis during the illegal detention, and so we must conclude that police would not have found the gun without the stop.
We recognize that Davis's statements during the illegal detention did not send police directly to the gun but only motivated their search. The result is nevertheless the same because exclusion under the fruit-of-the-poisonous-tree doctrine "extends as well to the indirect as the direct products of unconstitutional conduct." Segura v. United States , 468 U.S. 796, 804, 104 S.Ct. 3380, 3385, 82 L.Ed.2d 599 (1984) (quotation omitted); and see, e.g., Murray v. United States , 487 U.S. 533, 542, 108 S.Ct. 2529, 2536, 101 L.Ed.2d 472 (1988) (observing that exclusionary rule may bar evidence found when police execute a search warrant that they obtained based on knowledge they gained during their earlier, unconstitutional entry); see also State v. Maldonado-Arreaga , 772 N.W.2d 74, 81 (Minn.App. 2009) (suppressing evidence found by a municipal police detective during his investigation prompted by information he received from federal immigration agents who obtained the information during an unconstitutional search).
Based on all these factors, we hold that evidence of the handgun should have been excluded as fruit of the poisonous tree. The exclusionary rule's "purpose is to deter-to compel respect for the constitutional guaranty in the only effectively available way-by removing the incentive to disregard it." Elkins v. United States , 364 U.S. 206, 217, 80 S.Ct. 1437, 1444, 4 L.Ed.2d 1669 (1960). The officer's conduct here is particularly suited for deterrence. The record does not reveal whether it is a common or uncommon practice in north Minneapolis for police to handcuff and question people merely because they appear as though they want to avoid police contact. But if courts do not deter the unconstitutional and demoralizing practice of detaining, handcuffing, sitting, and questioning people merely because they want to avoid police contact, the practice will only increase the number of people who want to avoid contact with police and will, consequently, add to the number of people who are then unconstitutionally detained merely for demonstrating this preference.
We recognize that the state supreme court has held that, when an automobile driver appears to be maneuvering his car intentionally to evade a police officer, the attempt to evade by itself may justify stopping the car. State v. Johnson , 444 N.W.2d 824, 827 (Minn. 1989). But the Johnson holding predates the United States Supreme Court's later description of evasive conduct by a pedestrian-even "headlong flight" from a police officer-only as "a pertinent factor in determining reasonable suspicion." Wardlow , 528 U.S. at 124, 120 S.Ct. at 676. Evasive conduct is a factor that, when coupled with other factors (like the fact that the person is fleeing "an area of heavy narcotics trafficking"), can justify stopping a pedestrian. Id . We offer no opinion as to whether the Johnson holding applies to pedestrian stops. The state supreme court has never had occasion to say so. Johnson has been cited to justify pedestrian stops, but, most notably, that has occurred when evasion is not the only basis for the stop. See, e.g., *57 State v. Dickerson , 481 N.W.2d 840, 843 (Minn. 1992), aff'd , 508 U.S. 366, 113 S.Ct. 2130, 124 L.Ed.2d 334 (1993) ("But defendant's evasive conduct after eye contact with police, combined with his departure from a building with a history of drug activity, justified police in reasonably suspecting criminal activity."). And the United States Supreme Court has similarly never decided whether evasion from police, standing alone, can justify stopping a pedestrian. Our holding today stands regardless of how that question might be resolved, because the alleged evasive conduct here is slight, at most. We observe in passing only that all of the federal circuits seem to accept Wardlow 's implication that stopping a pedestrian requires more than evasive conduct by itself.[1]
III
The state argues alternatively that the handgun should not be suppressed because Davis abandoned it before the stop and because property so abandoned cannot be suppressed as fruit of the poisonous tree. Although the district court did not expressly find that Davis abandoned the gun before the stop, Davis does not contest the state's characterization and the finding can be readily inferred from the circumstances and the district court's analysis.
The state's argument implies a misunderstanding of law. Abandonment is not a per se exception to fruit-of-the-poisonous-tree exclusion. It is true that when *58 a "defendant cannot reasonably have any continued expectancy of privacy in ... discarded property, the property will be deemed abandoned for purposes of search and seizure." City of St. Paul v. Vaughn , 306 Minn. 337, 346-47, 237 N.W.2d 365, 371 (1975). But Davis did not argue that police violated his constitutional rights by invading his possessory interest or his reasonable expectation of privacy by seizing or searching the gun ; he argued (and the district court correctly held) that police violated his constitutional rights by seizing his person without reasonable suspicion. He argues additionally that, as a consequence of that illegal seizure, the gun must be suppressed not because it is the fruit of an unconstitutional search of his property but because it is the fruit of the unconstitutional seizure of his person.
The supreme court's abandonment holding cannot mean that abandoned property is never subject to exclusion as fruit of the poisonous tree. We know this because the supreme court has also held that, when a defendant has "abandoned [contraband] after he was unlawfully directed to stop, the abandonment was the suppressible fruit of the illegality." Matter of Welfare of E.D.J. , 502 N.W.2d 779, 783 (Minn. 1993). The state attempts to distinguish E.D.J. by relying too heavily on the word "after" in the holding and pointing out that Davis abandoned the gun before, not after, the officer's illegal stop. Under the state's theory, courts may not apply the fruit-of-the-poisonous-tree doctrine to exclude evidence that was abandoned by the defendant before police engaged in the unconstitutional activity that led to its discovery. The state's theory again misses the point; the abandonment doctrine establishes only that, when a person abandons an item before police have searched or seized it, he also abandons any claim that the officer's postabandonment search or seizure unconstitutionally interferes with any valid possessory interest or reasonable expectation of privacy in the item. The abandonment doctrine does not suggest that the person has lost any other constitutional challenge to admissibility.
The factual setting of E.D.J. illuminates why its statement about the timing of the abandonment does not matter here. Patrol officers ordered E.D.J. to stop, after which E.D.J. dropped a baggie of cocaine as he walked away. 502 N.W.2d at 780. Police seized the baggie. E.D.J. asked the district court to suppress evidence of the drugs because he had abandoned them only because police had unconstitutionally stopped him. Id. The district court found instead that E.D.J. had abandoned the drugs before the police seized him and reasoned consequently that the abandonment could not have been caused by the illegal stop. Id. On review in the supreme court, the key question was whether the evidence established that E.D.J. abandoned the baggie before or after the unconstitutional stop. Id . at 783. When the E.D.J. court highlighted its conclusion that E.D.J. abandoned the baggie after the unconstitutional stop, it was not stating or implying that property abandoned before an unconstitutional stop is always immune from suppression. Unlike E.D.J., Davis does not contend (and the facts do not suggest) that he abandoned the contraband because the police had unconstitutionally stopped him. He argues instead that police would never have discovered the already-abandoned gun had they not illegally stopped him. Put another way, the issue in E.D.J. was whether police exploited the illegal stop to cause the abandonment, while here, the issue is whether police exploited the illegal stop to cause the search. The temporal distinction in E.D.J. is therefore not material in this case.
Untethering the abandonment doctrine from the circumstance to which courts *59 have applied it leads to absurdities. If we follow the state's temporal argument to its logical end, for example, police who speculate that a murder suspect may have abandoned a murder weapon that bears his DNA could simply bludgeon the general location of the abandoned weapon out of the suspect. Then they could search the area for the weapon without fearing that the exclusionary rule would bar the state from introducing it as evidence. We can imagine myriad hypothetical circumstances like this to illustrate the error in the state's reasoning. And contrary to the state's reasoning, courts indeed have applied the fruit-of-the-poisonous-tree doctrine when considering whether to exclude evidence even when the defendant discarded the evidence before police engaged in the unconstitutional activity that led them to search for it. Most famously, the Supreme Court applied the doctrine when considering whether to exclude evidence of a murdered child's body that the defendant left in a rural ditch long before police engaged in the unconstitutional interrogation that led them to the area where they found the body. Nix v. Williams , 467 U.S. 431, 448, 104 S.Ct. 2501, 2511, 81 L.Ed.2d 377 (1984). We are satisfied that the state's reading of E.D.J. does not accurately reflect its holding or the law.
Properly applied, E.D.J. supports our holding today. It is true that, unlike in E.D.J. where the illegal stop itself caused the defendant to abandon the later-challenged evidence, in this case the illegal stop did not cause Davis to abandon the gun; under the state's theory he had already secretly abandoned it before the stop. But the illegal stop included questioning and the incriminating statements that inspired police to search the area and find the abandoned gun. This causal connection between the illegal stop and the recovered contraband is analogous to the connection in E.D.J. , where the illegal stop led police to recover the abandoned drugs. Whether Davis abandoned the handgun before or after the unconstitutional seizure is therefore not relevant to our question of whether the unconstitutional seizure led police to search for and find the handgun. Evidence is subject to the exclusionary rule if police obtained it by unconstitutionally exploitative activity rather than "by means sufficiently distinguishable to be purged of the primary taint" of the unconstitutional activity. Wong Sun , 371 U.S. at 488, 83 S.Ct. at 417. That is, like the operative circumstance in E.D.J. , police here obtained the evidence specifically because of unconstitutional police activity. The evidence is therefore similarly subject to the exclusionary rule under the fruit-of-the-poisonous-tree doctrine.
The only question that remains is whether to reverse Davis's conviction based on the constitutional error of admitting the handgun into evidence. We will hold that a constitutional error requires reversal for a new trial unless we determine beyond a reasonable doubt that the error was harmless. State v. Caulfield , 722 N.W.2d 304, 314 (Minn. 2006). The error here exposed the jury to the only evidence establishing that Davis possessed a handgun. The state therefore cannot show that the error of admitting the handgun was harmless beyond a reasonable doubt, and we must reverse to allow for a new trial based only on evidence constitutionally obtained.
We appreciate that the people, through their legislature, have entrusted police with the difficult duty to find and remove guns from felons prohibited from possessing them. We also recognize that hunch-based policing might sporadically and infrequently uncover contraband. In fact, we assume that an officer who stops enough people based only on conjecture will occasionally *60 find someone who, like Davis, apparently possesses evidence of a crime. But police officers are also entrusted with the higher duty to honor the constitutional rights of those they encounter. And as the district court correctly determined, the officer's decision to stop Davis did not rest on any power afforded to the officer by the Constitution. It is the court's duty to suppress evidence unconstitutionally obtained.
DECISION
The district court clearly erred by finding that the officer did not base his decision to search the area on information he drew from Davis during his unconstitutional stop and detention. We hold that the district court should have excluded evidence of the handgun as fruit of the unconstitutional stop even if Davis abandoned the handgun before the stop. We remand for further proceedings.
Reversed and remanded.

See United States v. Scott , 270 F.3d 30, 41 (1st Cir. 2001) ("An individual's flight from police combined with other observations by a police officer may support reasonable suspicion sufficient for detention under Terry ."); United States v. Muhammad , 463 F.3d 115, 123 (2d Cir. 2006) (validating stop because "[t]he officers' personal observation of Muhammad's evasive conduct was the additional factor ... that corroborated the anonymous tip" of a man carrying a gun); United States v. Navedo , 694 F.3d 463, 472 (3d Cir. 2012) (observing that "such flight [in a high crime area] and the setting in which it occurs, is merely one of many factors police may reasonably consider before making an investigative stop under Terry "); United States v. Bumpers , 705 F.3d 168, 175 (4th Cir. 2013) (stating that defendant's evasive conduct was one of several factors justifying a stop when the defendant also was outside a shopping center where many shootings and drug arrests occurred and he was standing in a manner and location that suggested he was trespassing); United States v. Jordan , 232 F.3d 447, 449 (5th Cir. 2000) (validating stop because of the defendant's flight from a store in a high-crime area along with "furtive glances over his shoulder" and the time of day); United States v. Jeter , 721 F.3d 746, 755 (6th Cir. 2013) ("The district court correctly found that Jeter's flight, in combination with the grabbing of his pocket in a 'high crime area,' provides the inference of suspicious behavior that justifies a Terry stop under Wardlow ."); White v. Hefel , 875 F.3d 350, 356 (7th Cir. 2017) (applying Wardlow to justify stop when police "spotted Hyles at night, on a street corner in a high crime neighborhood known for significant gang presence and a flourishing drug trade" and Hyles "turned on his heels and sped off"); United States v. Simpson , 439 F.3d 490, 496 (8th Cir. 2006) ("We note that law enforcement may conduct an investigative stop when a suspect flees from the police without provocation and where the area in question is known for heavy narcotics trafficking."); United States v. Smith , 633 F.3d 889, 894 (9th Cir. 2011) ("It is undisputed that Smith was in a high-crime neighborhood during the events in question, that Officer Dominguez clearly identified himself as a police officer, and that Smith burst into headlong flight for no other reason than to evade Officer Dominguez."); United States v. Guardado , 699 F.3d 1220, 1224 (10th Cir. 2012) ("Mr. Guardado's flight from police compounded their reasonable suspicion that he was engaged in some type of criminal activity."); United States v. Franklin , 323 F.3d 1298, 1302 (11th Cir. 2003) ("We believe this flight-combined with the other factors-gave the officers reasonable suspicion to stop Franklin."); United States v. Edmonds , 240 F.3d 55, 62 (D.C. Cir. 2001) (validating stop when flight from police was among three other factors establishing reasonable suspicion of criminal activity).