In the

# United States Court of Appeals

## For the Seventh Circuit

No. 16-1051

MICHAEL A. WHITE, *et al.*,

*Plaintiffs-Appellants*,

*v.*

STEVEN L. HEFEL, *et al.*,

*Defendants-Appellees*.

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 12 C 7853 — **Charles R. Norgle**, *Judge*.

ARGUED SEPTEMBER 6, 2017 — DECIDED NOVEMBER 7, 2017

Before WOOD, *Chief Judge*, and ROVNER and SYKES, *Circuit Judges*.

WOOD, *Chief Judge*. Shortly after 9:00 in the evening on September 30, 2011, Semajay Hyles charged uninvited into the White family's Chicago home. No more than a few minutes later, police officers pushed past Michael White, Sr., and followed Hyles into the house. They found Hyles huddled in a basement room and arrested him, but they did not leave the house right away. Instead, they spent some time searching it

before finally departing. The Whites did not appreciate the intrusion, and so they brought this suit under 42 U.S.C. § 1983, seeking damages related to the entry and search of their home. The district court ultimately denied cross-motions for summary judgment, but at trial, it granted judgment as a matter of law for the defendant officers on three claims. The jury ruled for the defendants on the remaining four claims, and the Whites now appeal. We can find no reversible error, and so we affirm the district court's judgment.

**I**

It is easy to understand why the district court thought that a trial was necessary in this case. The parties' accounts of what happened differ significantly. The plaintiffs—Michael White, Sr., his wife Linda, and their three children—testified that just before the events in question, Michael Sr. was escorting some visitors outside. He had gotten as far as the street when an unknown teenager (Hyles) ran up to the unlocked door, opened it, ran in, and locked it behind him. Police officers who were chasing the teenager quickly arrived and began to kick down the door. Michael Sr. tried to let them know that he had a key to the house, but before he could get that message across, one of the officers shoved him down the stairs, injuring him. With their guns drawn, the officers kicked down the door, went into the house, and found Hyles. After Hyles was secured, they thoroughly searched the house even though they had no warrant and the urgency had passed. The police claimed that Linda gave her consent for the search, but Linda denied that. Instead, she said, they pushed some forms in front of her in the waning light, and she thought that she was signing only a complaint for criminal trespass.

The police painted quite a different picture. As they portrayed the evening's events, the encounter began when six Chicago Police Department (CPD) officers spotted Hyles on a nearby street corner. When one of the officers tried to speak with him, Hyles fled. The officers pursued him, partly in their squad cars, partly on foot. Some of the officers saw Hyles drop a baggie, which (when it was eventually retrieved) turned out to contain crack cocaine. The route that the squad cars took was recorded on the GPS systems in the cars; we discuss this further when we consider the Whites' argument that some of the testimony from the police describes physically impossible events. The police wound up in the vicinity of the Whites' house. One officer observed Hyles unsuccessfully try to open the gate of a nearby home; other witnesses testified that he approached several places. He got lucky at the Whites' home, where the door was unlocked. An officer testified that Hyles kicked the door open. When the officer tried to follow Hyles, the officer accidentally collided with Michael Sr. and both fell down. The officers arrested Hyles, and then, with Linda's consent, they searched the home and obtained her signature on complaints against Hyles.

Approximately a year after these events, Michael Sr., Linda, and the three children brought this suit under 42 U.S.C. § 1983 and state common law. In it, they raised a host of theories arising out of the Hyles incident. The critical ones for present purposes are Counts I and III, which raise claims of the use of excessive force in violation of the Fourth Amendment; Count XI, asserting a failure on the part of some officers to intervene; and Counts V, VII, and VIII, which raise unconstitutional seizure and detention, entry, and search claims, also under the Fourth Amendment. (For those who would like a

comprehensive list of the counts and their disposition, we include a table showing who made which claims, and how they were resolved, in an appendix to this opinion.)

Jurisdiction over the federal claims was proper under 28 U.S.C. §§ 1331 and 1343; the state-law claims fell within the court's supplemental jurisdiction, 28 U.S.C. § 1367. Before the trial, the court denied the plaintiffs' motion for summary judgment on Counts VII, VIII, and XI. The Whites' argument was that the police account of the chase was incredible as a matter of law because the GPS units in the squad cars contradicted the officers' testimony. The court granted judgment as a matter of law to all of the individual defendants on the claims of illegal seizure, illegal entry of the home, illegal search of the home, and indemnification. (For reasons that are unclear, the court also instructed the jury on Count XI, though it had previously granted judgment as a matter of law.) The excessive-force and failure-to-intervene claims went to trial before a jury, which ruled in the defendants' favor. This appeal followed.

## II

### A

We can dispose of one part of this appeal easily. The Whites sought summary judgment in their favor on Counts VII, VIII, and XI, but the court found disputed issues of fact that warranted a trial. The Whites would like us to review that issue, but they have overlooked the rule against revisiting summary judgment after trial. See *Ortiz v. Jordan*, 562 U.S. 180, 184–85 (2011); see also *Chemetall GMBH v. ZR Energy, Inc.*, 320 F.3d 714, 718 (7th Cir. 2003). There are good practical reasons

for this rule. Once a trial has taken place, we have an authoritative decision by a jury resolving whatever disputes of fact existed. If the jury behaved irrationally, there are two safeguards built into the system: first, the losing party can file a motion under Federal Rule of Civil Procedure 59 and seek a new trial on the ground that the verdict is against the manifest weight of the evidence; second, the party that believes that a claim should not reach the jury is free to file timely motions under Rule 50(a) and (b) for judgment as a matter of law. In the latter instance, the moving party will seek to persuade the court that the case should not go (Rule 50(a)) or never should have been sent (Rule 50(b)) to the jury. Going back to the earlier summary judgment stage and plugging one's ears to the actual evidence that the jury heard would be, at a minimum, wasteful, and at worst, would fail to take account of the actual trial that took place and the jury's response.

When they were seeking summary judgment, the Whites argued that the GPS data from the squad cars conclusively showed that the officers' chase of Hyles could not have happened as they said it did. The district court decided, however, that the officers' account was not incredible as a matter of law (in contrast, for instance, to an assertion that someone drove in an ordinary car the roughly 1,100 miles from Chicago to Houston in just three hours). Instead, the court ruled that the differing accounts required "credibility determinations … best suited for a jury." This was a reasonable assessment of the evidence. But even if the district court's assessment had been unreasonable, the jury has now resolved all credibility disputes, and *Ortiz* holds that a party may not appeal an order denying summary judgment after a full trial on the merits. That rule requires us to refrain from revisiting the district court's summary judgment ruling.

B

Trying another tack against the GPS evidence, the Whites also argue that the district court erred by refusing at the trial to admit the GPS evidence and some exhibits related to it. The GPS charts themselves contained coordinates that correspond to points on a map. The Whites wanted to use two sources of evidence: first, testimony from Captain Martin Ryczek based on deposition testimony he had given in a different case about the GPS system that CPD used in 2012; second, some demonstrative maps and exhibits that a paralegal had created by plugging the GPS information from the squad cars into Google Maps, PowerPoint, and Synfig, in an effort to recreate for the jury the path that the cars took. The district court excluded Ryczek's testimony under Federal Rule of Evidence 403, which permits exclusion of relevant evidence if its probative value is substantially outweighed by the danger of confusing the issues. That was the situation here, the court concluded. It was undisputed that the police first spotted Hyles some distance from the Whites' house, and that they wound up at the house after pursuing him. The court regarded the risk of confusing the jury with marginally relevant details about the GPS system used by the Chicago police as too great, and the utility of this evidence too small, to require its admission.

And those were not the only problems with Ryczek's proposed testimony. The court concluded that it was expert testimony for purposes of Rule 702. This meant that the Whites had a duty to disclose it to the defendants, FED. R. CIV. P. 26(a)(2), and they had done no such thing. The Whites argue that Ryczek was not an expert, because he was simply explaining the GPS charts and how the data could be used. Yet

at trial the Whites said that Ryczek would "authenticate and interpret and explain the records." We have looked at the records, which are quite dense. The district court reasonably concluded that the role the Whites wanted Ryczek to play was that of an expert. Finally, Ryczek's deposition addressed the GPS system CPD was using as of a year *after* the Hyles incident. While we understand the Whites' position that there was no material change from 2011 to 2012, this discrepancy is also a strike against them.

The Whites also insist on appeal that the court should have allowed the jury to see the computer re-creation of the chase prepared by their paralegal. They emphasize that all the paralegal did was to take GPS coordinates, plug them into a bigger map, and deduce the route that each squad car must have taken. Charts and summaries are admissible to demonstrate extensive data that cannot easily be examined in court. FED. R. EVID. 1006. The proponent of the summary, however, must show that the underlying records are accurate and would be admissible. *United States v. Oros*, 578 F.3d 703, 708 (7th Cir. 2009). The Whites ask, rhetorically, how anyone could object to their maps, when all they did was take a certain set of points on a small map and put them on a larger map. But that overlooks the larger problem, which is that the routes driven by the various patrol cars tell us very little about which officers were driving, which ones were on foot, when the cars were stopped, and why it matters what route, and by what means (running or driving) the officers made it to the Whites' front door immediately behind the fleeing Hyles. The paralegal's map, the court reasonably concluded, slid over these questions and could have diverted the jury's attention from the central issues in the case. In so ruling, the court did not abuse its discretion.

C

This brings us to the entry and search of the Whites' home. They begin by arguing that the district court erred when it found that the police had probable cause to enter the house. That finding lay behind the court's decision to grant judgment as a matter of law on several of the claims.

The police first spotted Hyles at night, on a street corner in a high crime neighborhood known for significant gang presence and a flourishing drug trade. When an officer approached Hyles to talk to him—something the police are entitled to do without any degree of suspicion, see *United States v. Childs*, 277 F.3d 947, 950 (7th Cir. 2002) (*en banc*)—Hyles did not stand still and answer. He turned on his heels and sped off. This mirrors what happened in *Illinois v. Wardlow*, 528 U.S. 119 (2000), where some police officers spotted a man in "an area known for heavy narcotics trafficking" and decided to talk to him. *Id.* at 121. Without any provocation, the man ran away. As in our case, the police pursued him and then stopped him. *Id.* At that point in *Wardlow*, the police conducted a protective patdown, found a weapon, and arrested the man. *Id.* The Supreme Court held that the stop did not violate the Fourth Amendment. *Id.*

Crediting the officers' account, as the district court was entitled to do for purposes of suppression of evidence, the police did not lose track of Hyles for any significant time. An officer was thus able to observe him try to open a gate, without success. They saw him run into the house, on the way passing the people at the Whites' front door. Michael Sr. told them that Hyles did not live there. No reasonable person could have thought that Mr. White had just invited Hyles into his home.

Looking at all the circumstances, the police at that point had probable cause to believe that Hyles was committing the crime of trespass. We therefore do not need to resolve the question whether any of the officers could have seen him drop the baggie of cocaine that was later recovered. Nor do any statements made by the officers relating to the cocaine make a difference: as the Supreme Court reiterated in *Devenpeck v. Alford*, 543 U.S. 146 (2004), the test for probable cause is an objective one, and so it does not matter if the offense for which probable cause exists is not closely related to the offense identified by the arresting officer. *Id.* at 154–55. What matters, and all that matters, is whether the facts known to the arresting officers at the time they acted supported probable cause to arrest. As we have said, the officers pursuing Hyles had probable cause to believe that he was committing criminal trespass.

The question remains whether they should have procured a warrant before they rushed into the Whites' home, but on these facts, that question answers itself. See *United States v. Santana*, 427 U.S. 38, 42–43 (1976) (no warrant needed when police in hot pursuit are acting on probable cause). The officers were in hot pursuit of a fleeing suspect. They were hardly going to shout into the house and ask Hyles to mark time while they checked in with a state judge. Moreover, they had good reason to conduct a protective search of the house. They had no idea, as they ran in, whether Hyles had a weapon, if he did whether he had dropped it on his way to the back room where he was found, whether anyone else in the house was in danger, or whether Hyles would resist arrest.

In their brief, the Whites also hint at the idea that the police did not leave the house within a reasonable time, but instead stayed for more than an hour and conducted a thorough

search. But this theory was not developed in their brief; it appears only as part of the argument that there was no probable cause to enter the house in the first place. The defendants thus never had the chance to counter it with their own evidence. The undue-duration argument is therefore forfeited.

## III

There are some troubling parts to this trial, to be sure. The Whites assert that the district court erred when it allowed Hyles's guilty plea in the criminal proceeding related to his break-in to be introduced, and worse, when it took judicial notice of the factual allegations in the plea transcript for purposes of bolstering its finding of probable cause to enter the house.

The facts with respect to the transcript of the guilty-plea proceedings are unusual, to say the least. The Whites had filed a motion *in limine* "[t]o bar all evidence, testimony, and arguments that defendants had probable cause to enter the White home to arrest Semajay Hyles because he pled guilty to possession of a controlled substance or because he was 'a felon.'" The defendants countered that the guilty plea was an "admission of facts" and thus relevant to the reason why the officers entered the house. The Whites rightly replied that the guilty plea had little or no relevance to what the officers knew as they pursued Hyles. At trial, the defendants produced both Hyles's certificate of conviction and the transcript.

That was when things took a strange turn. The district court properly noted that "later learned evidence does not establish that there was earlier probable cause." The court thus ruled that "the defendants will not be permitted to argue to the jury that there was probable cause on the issue of whether

the male possessed narcotics as established by his judgment of conviction entered against him." At trial, however, in his opening statement, the Whites' counsel repeatedly argued that the police could not have seen anything amiss. During the case-in-chief, Linda White testified that when Hyles ran into the house, she did not see any weapons and Hyles said he had nothing. At that point the court ruled that the Whites had opened the door to the question of Hyles's guilt, and that evidence of his conviction could come in. Even then, the defendants planned to introduce only the certified judgment of conviction and pages 2–3 of the guilty-plea transcript, which contained the court's recitation of the charge and Hyles's acknowledgement that his plea was voluntary. It was *plaintiffs* who insisted that if that much of the transcript was coming in, the whole thing should be read. The court acquiesced.

Once the transcript was in, the court took the position that it could take judicial notice of the factual allegations that underlay Hyles's guilty plea. This was mistaken. Under Federal Rule of Evidence 201, a court may take judicial notice only of facts that are beyond reasonable dispute. *Gen. Elec. Capital Corp. v. Lease Resolution Corp.*, 128 F.3d 1074, 1083 (7th Cir. 1997). Far from satisfying this requirement, the factual allegations in the plea transcript, which purported to describe the events of September 30, 2011, were hotly contested: they lay at the heart of the dispute in this case. The only question that matters is whether this error was one that requires reversal. We think not. A party who invites error cannot later complain of it, even if the error is plain. *United States v. Addison*, 803 F.3d 916, 919 (7th Cir. 2015). Here, just as the court initially recognized, Hyles's guilty plea had little or nothing to do with what the officers knew as they were chasing Hyles. We conclude that the court's error in attempting to take judicial notice of

the statements in the plea transcript was either harmless or waived.

The Whites also touch on several other alleged errors at the end of their principal brief, including (1) that the court should have permitted Michael Sr. to introduce evidence of his medical bills (according to him, $4,610.37), which he incurred as a result of injuries he suffered when he was pushed down the stairs by the police; (2) that the court erred by instructing the jury that it had to find that the Whites were harmed in order to recover on their excessive-force claims; and (3) that it gave the jury the option of finding nominal damages of $1, over the Whites' objection.

The reason the court gave for excluding the medical-bill evidence was that Michael Sr. had not yet paid the bills. In Illinois (to whose law we look for guidance on this point), whether a medical bill is paid is the touchstone for whether the expense is reasonable. *Barreto v. City of Waukegan*, 478 N.E.2d 581, 589 (Ill. App. Ct. 1985). Payment is not the exclusive way to demonstrate reasonableness, however. It is also acceptable for a "person having knowledge of the services rendered and the usual and customary charges for such services" to testify that the charges are "fair and reasonable." *Arthur v. Catour*, 833 N.E.2d 847, 853–54 (Ill. 2005). The problem here is that the Whites never called the medical record-keepers they had included on their witness list, and so the jury never heard the necessary evidence. This was simply a failure of proof, not a ruling that unpaid medical bills can never be used at a trial.

The Whites' second point is well taken: the key inquiry in an excessive-force case is the amount of force used, not the

degree of harm that was inflicted on the victim. Thus, in *Hudson v. McMillian*, 503 U.S. 1 (1992), in the course of addressing an Eighth Amendment claim, the Supreme Court had this to say:

> When prison officials maliciously and sadistically use force to cause harm, contemporary standards of decency always are violated. … This is true whether or not significant injury is evident.

*Id.* at 9 (citation omitted); see also *Wilkins v. Gaddy*, 559 U.S. 34, 37–40 (2010) (vacating dismissal of excessive-force claim because the district court erroneously focused on extent of injury rather than nature of force applied). *Wilkins* noted, however, that the extent of injury might shed light on the question whether the degree of force used could plausibly have been thought necessary by the officer. *Id.* at 37.

To the extent that the instructions failed to convey these nuances, however, we conclude that any error was harmless. The Whites were allowed to, and did, argue in closing that harm need not be physical. This was enough to alert the jury to Linda's distress as a source of harm. And the jury was well aware of Michael Sr.'s testimony that he had been thrown down a flight of concrete stairs—something that easily could lead to more than *de minimis* injury. The question before the jury was whether the police, in hot pursuit of Hyles, pushed past Michael Sr., inadvertently causing him to lose his balance and fall, or if they deliberately pushed him aside in an excessive use of force. The evidence could have supported either conclusion. As it was entitled to do, the jury chose to believe the police.

## IV

The Whites have raised several other points as well, but it is enough to say that we see nothing that requires discussion. The judgment of the district court is therefore AFFIRMED.

## Appendix

| Count | Theory | Plaintiffs | Defendants | Disposition |
|---|---|---|---|---|
| I | Exc. force – 4th am. | Michael Sr. | Hefel | Jury for defendant |
| II | Battery | Michael Sr. | Hefel, City | Vol. dismissal |
| III | Exc. force – 4th am. | Linda and Michael Jr. | Hefel, Homer, Ramaglia, Laurie, Suing, O'Keefe ("Individual Defendants") | Vol. dismissal of Michael Jr.'s claim; jury for Hefel |
| IV | Assault | Linda and Michael Jr. | All defendants | Vol. dismissal |
| V | Illegal seizure and detention – 4th am. | All plaintiffs | All defendants | JMOL for all defendants |
| VI | False imprisonment | All plaintiffs | Individual defendants | Vol. dismissal |
| VII | Unconstitutional entry – 4th am. | All plaintiffs | Individual defendants | No sum. jdgt. for plaintiffs; JMOL at trial for defendants |
| VIII | Unconstitutional search – 4th am. | All plaintiffs | Individual defendants | No sum. jdgt. for plaintiffs; JMOL for defendants |
| IX | Trespass and illegal search | All plaintiffs | All defendants | Vol. dismissal |
| X | Damage to property | Michael Sr. and Linda | All defendants | Sum. jdgt. for some defendants; dismissed in a pre-trial ruling for others |
| XI | Failure to intervene – 4th am. | All plaintiffs | Homer, Ramaglia, Laurie, Suing, and O'Keefe | No sum. jdgt. for plaintiffs; jury for defendants |
| XII | Indemnification from City | All plaintiffs | City | JMOL for defendant |